In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2037

ALVIN MARKS,

Plaintiff-Appellant,

v.

LARRY CARMODY and ANTHONY CINQUEGRANI,

Defendants-Appellees.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern
Division.
No. 97 C 5013--Matthew F. Kennelly, Judge.


Argued November 8, 2000--Decided December 12,
2000


  Before Bauer, Rovner, and Diane P. Wood,
Circuit Judges.

  Diane P. Wood, Circuit Judge.  On August
1, 1996, Detective Larry Carmody and
Sergeant Anthony Cinquegrani, both of the
Wheeling, Illinois, Police Department,
arrested Alvin Marks for issuing a bad
check with intent to defraud, in
violation of the Illinois Deceptive
Practices Act, 720 ILCS sec. 5/17-1.
Although the state court immediately
dismissed the criminal charges against
him at the first preliminary hearing,
upon the state's attorney's nolle
prosequi motion, Marks was not satisfied.
Following up on a threat he had made, he
sued both arresting officers under 42
U.S.C. sec. 1983 for false arrest. The
district court concluded that the
defendant officers were protected by
qualified immunity from suit, and on that
basis granted their motion for summary
judgment. We agree that this was the
proper disposition of the case, and we
therefore affirm.

I

  Marks was the owner of LTD Travel

Agency, Inc., located in Wheeling, and Judith Bechar owned a competing agency, Bravo Travel Services. In late 1995, Marks and Bechar decided to merge their operations. As a first step in that process, Marks incorporated a new entity, Bravo/LTD Travel. Bechar moved her operations into LTD's premises. At the same time, Marks gave up LTD's Airline Reporting Corporation (ARC) number (something a travel agency must have in order to issue tickets), and both LTD and Bravo used Bravo's ARC number.

In December of 1995, Marks purchased some personal airline tickets through Bravo/LTD, but because the formal merger had not yet taken effect, they were charged to Bechar's account for Bravo as a "house credit" transaction. Marks and his family used the tickets for a family vacation, and returned in early January 1996. On Friday, January 5, 1996, Nessim Bechar (Judith's husband), confronted Marks and demanded an immediate payment of some $1,800 for the tickets. Marks pointed out to Nessim that Bravo owed him approximately $3,000 in commissions, and he suggested an offset. Nessim refused, but (according to Marks, whose account we accept for purposes of summary judgment review) the two agreed that Marks would issue a check for the $1,800, and the next day Judith (who was unavailable, and who was the only one authorized to write checks for Bravo) would issue a check to Marks for the $3,000 in commissions. As Marks understood it, this would be accomplished mechanically by having Marks write his check to Bravo/LTD, having Judith do the same, and then having Bravo/LTD issue an $1,800 check to Judith for Bravo and a $3,000 check to Marks.

Marks accordingly gave Nessim a check for $1,800, which showed Bravo/LTD as the payee and was post-dated one day forward, to January 6, 1996. The very next day Judith pulled out of the merger and refused to issue the $3,000 commission check. In the meantime, however, the Bechars had promptly attempted to cash the $1,800 check on January 5. Either because Marks's account, without the $3,000 deposit, did not have sufficient funds to cover the $1,800 check, or because Marks was upset about the termination of the merger, Marks stopped payment on the check. When Judith received the returned check, she brought

civil charges against Marks seeking the $1,800 and other damages resulting from the collapse of the merger. Her civil suit was eventually dismissed without any money changing hands.

   The feud between the would-be business partners did not end with civil litigation, unfortunately. In mid-February 1996, the Bechars lodged a criminal complaint with the Wheeling, Illinois, Police Department and, in support of their complaint, gave Detective Carmody the following information. The Bechars (or Bravo, which amounted to the same thing) were charged for airplane tickets that Marks bought for personal use. Marks purported to pay them for the tickets, but the check that he issued was returned for insufficient funds. (The bank later admitted that it actually meant to return the check under the stop payment order, rather than for insufficient funds. This detail is unimportant to our case, because as Detective Carmody discovered, the bank records showed that if the stop payment order had not been issued, the check would still have been returned for non-sufficient funds.) Carmody investigated the Bechars' complaint for several months. During that time, he discovered that at the time Marks wrote the check and for three days afterward, the account did not have enough funds to cover the check. Additionally, subpoenaed bank records revealed that four other checks drawn on Marks's account had been returned within the same 30-day time period. He also interviewed Marks by telephone and learned about the failed merger and the stop payment order.
   On August 1, 1996, Detective Carmody contacted Marks and asked him to come to the police station for a personal interview. Marks agreed, and showed up with his lawyer. Marks and the lawyer pointed out to the detective the fact that the $1,800 check had been made payable to Bravo/ LTD, not to Judith Bechar or to Bravo. The lawyer showed the detective the articles of incorporation of Bravo/LTD, which revealed that Marks alone was an incorporator of the company and Judith was not. This fact, Marks argued, made it logically impossible for him to have committed a fraud, because the only entity he would have been defrauding was one that he owned himself. The lawyer also showed Detective Carmody

a 23-year-old case from the Illinois appellate court that appeared to hold that the issuance of a worthless check for a preexisting debt did not violate the statute under which Detective Carmody was proceeding, 720 ILCS sec. 5/17-1. See People v. Cundiff, 305 N.E.2d 735, 737-38 (Ill. App. Ct. 1973). Marks also gave Carmody documents related to the civil suit between himself and the Bechars (which included a claim for the disputed $1,800) and a copy of the airline tickets showing that they had been used before the check was issued. All of this meant, in the view of Marks's lawyer, that Marks did not have the intent to defraud required by the criminal statute.

Detective Carmody did not see things that way, however; he indicated instead that he was going to arrest Marks. The lawyer then threatened Carmody with a suit under 42 U.S.C. sec. 1983, at which point Carmody brought Sergeant Cinquegrani into the room. Marks's attorney then reviewed the entire matter for the two officers. In the end, with Sergeant Cinquegrani's approval, Detective Carmody placed Marks under arrest.

As promised, Marks followed up with the present lawsuit under sec. 1983. In it, he claimed that his Fourth and Fourteenth Amendment rights had been violated, his reputation had been sullied, and he had suffered pecuniary injuries. Upon the defendants' motion for summary judgment, the district court concluded that even though it was not prepared to hold that there was probable cause for the arrest, the two officers were entitled to qualified immunity on this record.

II

The question now before us is thus not whether the officers were ultimately correct when they concluded that there was probable cause to arrest Marks for a violation of the Illinois Deceptive Practices Act. It is instead the objective question whether a reasonable officer, knowing what these two knew, would have known that the law as applied to these circumstances clearly established that an arrest would be unlawful for lack of probable cause. As the district court recognized, qualified immunity protects arresting police

officers from suit if a reasonable officer would have believed the arrest to be lawful, in light of clearly established law and the information that the arresting officers possessed. Hunter v. Bryant, 502 U.S. 224, 227 (1991). This standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." Id. at 229, quoting Malley v. Briggs, 475 U.S. 335, 343, 341 (1986). See also Anderson v. Creighton, 483 U.S. 635, 640 (1987) (emphasizing the need to assess qualified immunity claims at the correct degree of particularity).

Illinois's Deceptive Practices Act makes it a crime for an individual, with intent to defraud, to issue a check, knowing that it will not be paid by the depository bank, either to pay for property, labor or services or to make a payment of an amount owed in a credit transaction. 720 ILCS sec. 5/17-1(B)(d) and (e). In making the decision to arrest Marks for this crime, the officers had the following information before them: Bravo (i.e., Judith Bechar) had paid approximately $1,800 for airline tickets that Marks had ordered and used for his own personal use; Nessim Bechar asked Marks to pay for the tickets, and Marks responded with a check that was returned unpaid; bank records show that, at the time that Marks issued the check, and for the next three days, his checking account did not contain sufficient funds to cover the check. A reasonable police officer would not have had any reason to believe that these facts were not enough to bring Marks's actions within the language of the deceptive practices statute.

The fact that Marks had alerted the officers to possible defenses he might have had to the crime does not change this result. Thus, for instance, the officers were not required to view the fact that Marks made out the check to a company that he himself had incorporated as something definitively negating the violation. Nor did they need to accept as established the evidence Marks had proffered that tended to show that he did not act with the requisite intent to defraud the Bechars. Issues of mental state and credibility are for judges and juries to decide. Spiegel v. Cortese, 196 F.3d 717, 725 (7th Cir. 1999); Hebron v.

Touhy, 18 F.3d 421, 423 (7th Cir. 1994). And while we can grant for present purposes that the evidence of intent on which the officers relied would not have been sufficient for a conviction, see People v. Bormet, 491 N.E.2d 1281, 1284-85 (Ill. App. Ct. 1986), probable cause does not require such a high degree of certainty. Humphrey v. Staszak, 148 F.3d 719, 727 (7th Cir. 1998).

Marks also argues that, because the check was postdated by one day, Detective Carmody should have realized that it was in legal effect a promissory note at the time it was tendered, rather than a check. See People v. McLaughlin, 462 N.E.2d 875 (Ill. App. Ct. 1984). But the defendant officers did not have before them any evidence that the parties agreed that the check could be postdated, or even that Nessim Bechar noticed the one-digit discrepancy. Without such evidence, it would be impossible to say that noreasonable officer could have concluded that the instrument Marks proffered was what it appeared to be--a check.

Finally, the defendants were not required to accept the assertion of Marks's attorney that the 23-year-old decision from the Third District of the Illinois Appellate Court in People v. Cundiff precluded a finding of probable cause. We are aware of no rule that requires police officers to accept the legal arguments offered by a suspect's attorney. Even if the officers had both read and fully understood Cundiff as well as a trained lawyer might, for all anyone at the police station knew, the case could have been narrowed or even overruled since it was first issued in 1973. Detective Carmody was not required to run off and run a computer search on the case's subsequent history and later interpretations of the statute from other Illinois courts before making an arrest.

In short, the officers here acted within reasonable bounds when they concluded that probable cause existed for Marks's arrest, even if, with the benefit of more time for reflection, the district court was also correct to conclude that this might have been an error. Marks wrote a check to cover the cost of airline tickets that had been charged to Bravo without Judith Bechar's consent, and that check was not honored. It was probably

obvious to the officers that there was some bad blood between the Bechars and Marks, but the arresting officers were not required to resolve those issues. The district court's judgment dismissing the case against them on qualified immunity grounds is therefore Affirmed.