In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1429

Stacey Morrell, individually and
as next friend for Joshua Morrell,
an infant,

Plaintiff-Appellant,

v.

Philip Mock, et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 2459--George W. Lindberg, Judge.

Argued September 15, 2000--Decided November 1, 2001


  Before Flaum, Chief Judge, and Kanne and
Williams, Circuit Judges.

  Williams, Circuit Judge.  Three law
enforcement officers, acting on
directions from two assistant state's
attorneys, took Stacey Morrell's child
from her home in Illinois and gave the
child to his putative father pursuant to
an ex parte order issued by a New Mexico
court. In this appeal we must decide if
Morrell has stated a claim for
deprivation, without due process, of a
constitutionally protected liberty
interest, and if so, whether the
defendants are entitled to qualified
immunity from suit. Although we hold that
Morrell's allegations are sufficient to
state a constitutional claim, we agree
with the district court that defendants
are entitled to immunity and therefore
affirm the judgment of the district
court.

I.  BACKGROUND

A. Facts
  Stacey Morrell had an affair with John
Howell while both were assigned to a
military base in Albuquerque, New Mexico.
After the affair ended, Morrell
reconciled with her husband, David, and
the couple moved to El Paso, Texas, where

David had been assigned for active duty. In El Paso, Stacey Morrell gave birth to Joshua Morrell. David Morrell was identified as the father on Joshua's birth certificate.

Meanwhile, Howell filed a "Petition to Establish Paternity, Custody, and Time Sharing" in a New Mexico court, and on the day before Joshua was born in El Paso, Howell attempted service on Morrell by posting a copy of the summons and petition on the premises of her former home in Albuquerque. Morrell never received that posted notice, and after she failed to enter an appearance, Howell moved for a default judgment. At a hearing on Howell's motion, New Mexico Judge Anne Kass ordered that Morrell be served by personal service and ordered her to appear in court on the day following service. That order was served on Morrell by hand delivery in El Paso, and when she failed to appear the next day, Judge Kass entered the following order:

IT IS FOUND IN OPEN COURT:

Respondent was personally served with an order to appear at 9:00 a.m. the first business day following service. She was personally served on June 17, 1998. She failed to appear at 9:00 a.m. June 18, 1998.

Respondent has intentionally been avoiding service of process in this paternity case.

Respondent has willfully failed and refused to participate in an orderly process to determine parentage.

IT IS ORDERED IN OPEN COURT:

I. Law Enforcement Authorities are authorized and requested to assist John D. Howell . . . in obtaining physical custody of a male child born on or about 3/17/98.

II. Upon obtaining physical custody, a parentage determination shall be undertaken. It may be undertaken in New Mexico or in South Carolina as Mr. Howell decides.

III. If parentage determination is undertaken in So. Carolina or in any

other state, New Mexico relinquishes jurisdiction to such other state to determine custody, visitation and child support issues.

IV. Judgment is entered against Stacey J. Morrell in favor of John D. Howell for fees and costs herein of $3,000.00.

After the order was entered, Morrell filed a special appearance contesting jurisdiction. At about the same time, David Morrell's active duty assignment in El Paso ended, and the family moved to Stacey Morrell's parents' home in Indiana while David Morrell sought new employment. There, Stacey Morrell filed a petition to establish paternity, and Howell responded with a motion to dismiss, relying on the New Mexico court's prior assertion of jurisdiction and asserting that he had already commenced another paternity action in South Carolina (where Howell resided). While the Indiana action was pending, David Morrell secured a job in Illinois, and the Morrells moved there with Joshua.

Howell then traveled to Illinois and filed the New Mexico order with the Will County Circuit Court clerk. Howell appeared that same day on an emergency motion before the Will County Circuit Court and requested enforcement of the New Mexico order by way of a body attachment (a civil writ ordering the seizure of a person). The Illinois judge refused to issue the writ without notice to Stacey Morrell. Undeterred, Howell went to the Will County State's Attorney's office and spoke to defendant Judy DeVriendt, an assistant state's attorney. DeVriendt telephoned the local police and told them to take custody of Joshua pursuant to the New Mexico order. When the local police went to Stacey Morrell's home, she showed them pleadings from the Indiana action. After consulting with their superiors, the police decided not to take custody of Joshua and advised Howell that they would not take further action without an order from the Will County court.

DeVriendt then consulted defendant Philip Mock, chief of the state's attorney's civil division. Mock reviewed the New Mexico order and the docket sheet from the hearing before the Will County Circuit Court, which showed that the

court had denied Howell's emergency motion for a body attachment. Mock then read the Illinois Uniform Child Custody Jurisdiction Act (UCCJA), 750 Ill. Comp. Stat. 35/1, et seq., which governs the recognition in Illinois of custody determinations of other states. He also checked the circuit court's computer database to determine whether any other orders or judgments involving these parties had been filed in Will County, and directed his subordinates to verify that the New Mexico order had not been vacated. Mock concluded that the New Mexico order was valid and directed DeVriendt to have the Will County Sheriff's Department pick up the child and give him to Howell.

Defendant Richard Ackerson, an investigator with the Will County Sheriff's Department, was assigned to the case. According to Ackerson, DeVriendt showed him the New Mexico order and paperwork from the Indiana action, told him that the New Mexico order had been validated by an Illinois judge, and directed him to arrest Morrell if she did not cooperate. Acting on her instructions, Ackerson and two deputy sheriffs, defendants Richard Holman and Keith Ploense, went to the Morrells' home. As she had when the police visited a few days earlier, Morrell showed the sheriff's deputies the paperwork from the Indiana action. She also asked them to speak by telephone with her lawyer in Indiana, who told them that the Indiana action had "superceded" the New Mexico order. Ackerson replied that he had instructions to serve the New Mexico order, which was the only one that had been "validated" in Illinois. Morrell gave Joshua to the deputies--after being threatened with arrest if she refused-- and the deputies gave the eight-month-old infant to Howell. Howell immediately returned to South Carolina with Joshua.

Later that day, Morrell appeared before another judge in Will County, who ordered Mock to retrieve the baby. Joshua was reunited with his mother four days later.

B. The District Court Proceedings

Morrell filed suit on behalf of herself and Joshua claiming a deprivation, without due process, of their liberty interests in familial relations protected

by the Fourteenth Amendment. After discovery, all parties moved for summary judgment. Without reaching the question of whether there had been a constitutional violation, the district court held that the deputies were absolutely immune from liability for damages arising from their execution of the court order. With respect to the assistant state's attorneys, the court held that reasonable persons in their position would not have known that ordering the child to be seized was unconstitutional, and that they were therefore entitled to qualified immunity from damages. The court therefore granted the defendants' motions for summary judgment, denied the plaintiff's cross motion for summary judgment, and entered judgment for the defendants.

II.  ANALYSIS

To evaluate defendants' claim of qualified immunity under sec. 1983, the court must decide (1) whether plaintiff has stated a claim for violation of her constitutional rights, and if so, (2) whether those rights were clearly established at the time of the violation, such that a reasonable official would understand that what he was doing violates those rights. Wilson v. Layne, 526 U.S. 603, 609 (1999); Mitchell v. Randolph, 215 F.3d 753, 755 (7th Cir. 2000). We first address the constitutionality of the defendants' conduct. Saucier v. Katz, 121 S.Ct. 2151, 2155-56 (2001); Pearson v. Ramos, 237 F.3d 881, 884 (7th Cir. 2001). On that question, "we are required to determine only whether [the plaintiff's] allegations, if true, state a claim of deprivation." Delaney v. DeTella, 256 F.3d 679, 683 (7th Cir. 2001); see also Katz, 121 S.Ct. at 2156. We review the district court's judgment de novo. McGrath v. Gillis, 44 F.3d 567, 569 (7th Cir. 1995).

A.The Constitutional Violation

Morrell contends that the New Mexico court lacked jurisdiction, and that the court's order could not be enforced in Illinois until Morrell received notice and an opportunity to be heard in Illinois. Her claim is based on a mother's liberty interest, protected by the due process clause of the Fourteenth

Amendment, in the companionship, care, custody, and control of her child. See Lassiter v. Dep't of Soc. Servs., 452 U.S. 18, 27 (1981); Brokaw v. Mercer County, 235 F.3d 1000, 1020 (7th Cir. 2000); Ellis v. Hamilton, 669 F.2d 510, 512 (7th Cir. 1982)./1 To meet the requirements of due process, the state must afford notice and an opportunity to be heard "at a meaningful time and in a meaningful manner." Armstrong v. Manzo, 380 U.S. 545, 552 (1965). We have held that, absent exigent circumstances, due process requires a hearing before state officials may remove a child from his home. Brokaw, 235 F.3d at 1020; Ellis, 669 F.2d at 512; accord Hollingsworth v. Hill, 110 F.3d 733, 739 (10th Cir. 1997); Hurlman v. Rice, 927 F.2d 74, 79-80 (2d Cir. 1991).

Defendants do not claim that there were exigent circumstances that would justify seizing the child before notice and hearing. Instead, they argue that Morrell's constitutional claim fails because of the availability of a post-deprivation hearing in Illinois. Their argument is based on Ellis v. Hamilton, 669 F.2d 510, in which we held, with respect to the plaintiffs' claim that they were denied due process when various state officials allegedly blocked their efforts to adopt their grandchildren, that due process was not denied because the state provided a "variety of remedies by which to correct" the officials' alleged misbehavior. 669 F.2d at 514. However, Ellis is distinguishable because in that case the grandparents acquiesced in the child welfare officials' directive to turn the children over, and the children were not (as in this case) taken from the home without prior notice and under a threat of arrest. See 669 F.2d at 515. Moreover, the right of the grandparents in Ellis is less compelling than the right of a biological, custodial parent, and therefore lesser procedural protections may be consistent with due process. See Weller v. Dep't of Soc. Servs., 901 F.2d 387, 394 (4th Cir. 1990) (distinguishing Ellis on this basis).

However, the defendants are correct that Morrell had actual notice of the New Mexico hearing (albeit less than 24 hours' notice) and then had more than four months to either raise her jurisdictional defenses in New Mexico or

pursue a collateral attack elsewhere before the order was enforced. The question, then, is whether in addition to prejudgment process provided in New Mexico, Illinois must provide pre-enforcement notice and an opportunity to be heard. On this point, Morrell argues that a state may not enforce another state's order without prior notice and a hearing. She relies on cases holding that a state's judgment "cannot be enforced out of the state by an execution issued within it." McElmoyle ex rel. Bailey v. Cohen, 38 U.S. 312, 325 (1839); Williams v. North Carolina, 325 U.S. 226, 229 (1945). But these cases do not prescribe the method that a state must use in domesticating another state's order; the method, as Morrell concedes, is determined by the local law of the enforcing state. See Baker v. General Motors, 522 U.S. 222, 235 (1998) (citing McElmoyle, 38 U.S. at 325; Restatement (Second) of Conflict of Laws sec. 99 (1969) ("The local law of the forum determines the methods by which a judgment of another state is enforced."))./2

Morrell next relies on cases holding that the Due Process Clause establishes limits on the rendering state's exercise of jurisdiction over non-residents, and that judgments entered beyond those limits are void and may not be enforced in that state or in any other, see, e.g., Williams, 325 U.S. at 229-30; Pennoyer v. Neff, 95 U.S. 714, 720-23 (1877), and on the principle that a defendant challenging a court's jurisdiction may ignore the court's proceedings, risk a default judgment, and resist enforcement in a collateral attack on the first court's jurisdiction. See, e.g., Williams, 325 U.S. at 229-31; Chicago Life Ins. Co. v. Cherry, 244 U.S. 25, 29 (1917); Thompson v. Whitman, 85 U.S. 457, 469 (1873); Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc., 212 F.3d 1031, 1034-35 (7th Cir. 2000); United States v. County of Cook, 167 F.3d 381, 388 (7th Cir. 1999) (observing that the exception from res judicata for collateral attacks challenging jurisdiction is necessary "because otherwise a court that lacked jurisdiction could strong-arm a party to litigate the subject, decide in favor of its own power, and thus block any review of its adjudicatory competence.")./3

Again, however, these cases do not establish any particular procedure that must be followed by a state asked to enforce another state's order, and do not hold that notice and a hearing on the question of the rendering state's jurisdiction must in all cases precede enforcement.

Closer to the question before us are two Supreme Court decisions considering what pre-enforcement process is due when a creditor seeks to enforce a judgment. In Endicott-Johnson Corp. v. Encyclopedia Press, Inc., 266 U.S. 285 (1924), the Court held that, having received full notice and hearing on the underlying judgment, the debtor was not entitled to further notice before execution of that judgment:

[T]he established rules of our system of jurisprudence do not require that a defendant who has been granted an opportunity to be heard and has had his day in court, should, after a judgment has been rendered against him, have a further notice and hearing before supplemental proceedings are taken to reach his property in satisfaction of the judgment. Thus, in the absence of a statutory requirement, it is not essential that he be given notice before the issuance of an execution against his tangible property; after the rendition of the judgment he must take "notice of what will follow," no further notice being "necessary to advance justice."

Id. at 288 (citations omitted).

However, a later case, Griffin v. Griffin, 327 U.S. 220, 232 (1946), appears to narrow the holding in Endicott. In Griffin, a wife litigated and won an award of alimony, and ten years later, without notice to the husband, she obtained a judgment that alimony payments were in arrears and a writ authorizing execution of that judgment. The Court held that the failure to give notice of the later proceedings violated due process, and therefore, that the judgment could not be enforced:

While it is undoubtedly true that the 1926 decree, taken with the New York practice on the subject, gave petitioner notice at the time of its entry that further proceedings might be taken to

docket in judgment form the obligation to pay installments accruing under the decree, we find in this no ground for saying that due process does not require further notice of the time and place of such further proceedings, inasmuch as they undertook substantially to affect his rights in ways in which the 1926 decree did not.

Id. at 232./4 The Court in Griffin did not make reference to Endicott, but many courts have interpreted Griffin as limiting Endicott's holding that notice and hearing on the underlying judgment serves as constructive notice of all that will follow. See, e.g., McCahey v. L.P. Investors, 774 F.2d 543, 548 (2d Cir. 1985); Brown v. Liberty Loan Corp. of Duval, 539 F.2d 1355, 1364-65 (5th Cir. 1976); see also Hanner v. DeMarcus, 390 U.S. 736, 741-42 (1968) (Douglas, J., dissenting from the dismissal of writ of certiorari on the question of overruling Endicott). These cases interpret Griffin as holding that, at least as to issues and rights that were not litigated in the underlying judgment, such as defenses to execution on particular assets, Endicott does not supply the answer. McCahey, 774 F.2d at 547-49; Brown, 539 F.2d at 1364-65; see also Aacen v. San Juan County Sheriff's Dep't, 944 F.2d 691, 695 (10th Cir. 1991); Dionne v. Bouley, 757 F.2d 1344, 1351-52 (1st Cir. 1985).

Viewed in light of Griffin, we agree that Endicott does not entirely foreclose consideration of whether the Due Process Clause requires post-judgment notice or other procedures. According to Morrell, because she failed to appear in New Mexico, she retained her right to collaterally attack jurisdiction elsewhere. As to jurisdiction (without which the judgment is void), Morrell never had the "day in court" that was the basis of Endicott's holding that no further pre-deprivation notice was required.

In determining, then, what post-judgment process (if any) is due, we must balance the nature of the private interests at stake, the risk of harm from erroneous deprivations, and the government's interests affected. See Mathews v. Eldridge, 424 U.S. 319, 335 (1976); Aacen, 944 F.2d at 695-96; McCahey, 774 F.2d at 548-49; Finberg v. Sullivan, 634

F.2d 50, 57-58 (3d Cir. 1980) (en banc); see also Weller, 901 F.2d at 394. We believe that the same considerations underlying the recognition of a parent's due process right to pre-deprivation notice and hearing justify the requirement of pre-deprivation notice and some opportunity to object in the enforcing state, at least when the rendering court's order is by default. To hold otherwise would force the parent to litigate her jurisdictional objections in any state chosen by an adverse party (even if, as Morrell asserts was the case here, the state lacked any connection with the child or personal jurisdiction over the parent), or else risk enforcement without notice in another state before she has an opportunity to mount a collateral attack. This result would be inconsistent with the due process limitations on a state's jurisdiction that the right of collateral attack protects, see Williams, 325 U.S. at 229; County of Cook, 167 F.3d at 388, and is also inconsistent with a proper balancing of the competing interests at stake.

A parent's liberty interest in her relationship with her child is of considerable importance--and "far moreprecious . . . than property rights." May v. Anderson, 345 U.S. 528, 533 (1953); see also Lassiter, 452 U.S. at 27; Santosky v. Kramer, 455 U.S. 745, 759 (1982); Weller, 901 F.2d at 394. And even though the interference with the mother's custody in this case was to be temporary, we cannot ignore the not insubstantial risk that once physical custody is erroneously transferred, it may never be regained. See Unif. Child Cust. Jur. Act, prefatory note, 9 U.L.A. 262, 264 (1999); Wayne Young, Parental Child-Snatching: Out of a No-Man's-Land of Law, 13 St. Mary's L.J. 337, 338 (1981) (estimating that, annually, as many as 100,000 children are kidnapped by a parent). The risk of erroneous deprivation is particularly grave in a case like this one in which custody was transferred based on an ex parte presentation, and when, therefore, the jurisdiction of the rendering court has not been tested in an adversarial proceeding.

We must also consider, however, the interest of the parent seeking to enforce a court's order transferring physical

custody. That parent has (at least potentially) an equally important interest at stake. And once a court has recognized that parent's right to custody, that parent has an important interest in having the court's determination enforced. Pre-enforcement notice may trigger flight by the parent with physical custody, making it more difficult (and perhaps, in some cases, impossible) to enforce the order. However, the rendering court's determination of proper custody has less weight when the question of the court's jurisdiction has never been litigated in a contested proceeding; without some procedure in the enforcing state, it is impossible for that state to determine whether the order is entitled to any weight at all. Moreover, if pre-enforcement process in the enforcing state is required, as urged by Morrell, any exigent circumstances (such as flight risk) can be considered by the enforcing court in determining whether action may be taken in advance of notice.

The state's interest, according to the defendants, is in facilitating interstate recognition and enforcement of child custody decrees and in deterring the unilateral removal of children by parents seeking to avoid jurisdiction. Illinois has addressed these interests in the Uniform Child Custody Jurisdiction Act (UCCJA), see 750 Ill. Comp. Stat. 35/2 (stating the purposes of the Act); see also In re Marriage of Mauro, 543 N.E.2d 856, 858 (Ill. App. Ct. 1989), which, the defendants contend, required them to enforce the New Mexico order without notice or hearing. They rely on section 16(a) of the Illinois Act, which provides for registration of out-of-state custody judgments:

A certified copy of a custody judgment of another state may be filed in the office of the clerk of any circuit court of this State. The clerk shall treat the judgment in the same manner as a custody judgment of a circuit court of this State. A custody judgment so filed has the same effect and shall be enforced in like manner as a custody judgment rendered by a court of this State.

750 Ill. Comp. Stat. 35/16(a)./5

However, the UCCJA's scheme for

cooperative interstate recognition of custody determinations rests on the premise that each state's interests are served by limiting the bases for a state's assertion of jurisdiction over a child custody determination, and requiring interstate recognition of only those determinations entered within those limits. See 750 Ill. Comp. Stat. 35/2; see also Unif. Child Cust. Jur. Act sec. 13 cmt., 9 U.L.A. 559 (1999)./6 To that end, Illinois law pro-vides the party opposing recognition and enforcement of another state's custody determination with notice and the opportunity to be heard on whether those jurisdictional prerequisites are met. See Gasaway v. Gasaway, 616 N.E.2d 610, 613 (Ill. App. Ct. 1993) (describing the procedures for domesticating another state's custody judgment); In re Marriage of Los, 593 N.E.2d 126, 131 (Ill. App. Ct. 1992); In re Marriage of Mauro, 543 N.E.2d 856, 858 (Ill. App. Ct. 1989); In re Marriage of Rogers, 490 N.E.2d 1000, 1003 (Ill. App. Ct. 1986). Although the Illinois statute does not specify that notice and an opportunity to be heard on jurisdictional prerequisites (both constitutional and statutory) must precede enforcement, courts interpreting the Illinois and uniform acts have held that it must, in order to allow the adverse party the opportunity to contest recognition and enforcement. See In re Marriage of Rogers, 490 N.E.2d at 1003; Holm v. Smilowitz, 840 P.2d 157, 165 (Utah Ct. App. 1992); Kilgore v. Kilgore, 666 S.W.2d 923, 929 (Mo. Ct. App. 1984); Wyatt v. Falhsing, 396 So. 2d 1069, 1072–73 (Ala. Civ. App. 1981); Beck v. Smith, 296 N.W.2d 886, 891-93 (N.D. 1980)./7

Given the importance that the Illinois child custody enforcement scheme places on proper statutory jurisdiction, we do not think that the state's interests weigh against providing pre-deprivation process before enforcing an out-of-state order when that order was entered without an adjudication of that court's statutory jurisdiction or whether the order was entered consistent with due process requirements of notice and jurisdiction. See Duchesne v. Sugarman, 566 F.2d 817, 828 n.26 (2d Cir. 1977) (stating that "the administrative and fiscal burden to the state can be of no moment" when the procedures were consistent with state requirements). And when we consider the nature of the interests at stake and the

gravity of erroneous deprivations to parents and children alike, we conclude that, absent exigent circumstances, due process requires, at a minimum, pre-enforcement notice and some opportunity to object before law enforcement officials may separate a parent from her child pursuant to an out-of-state default order transferring custody.

We therefore hold that Morrell has stated a claim for deprivation, without due process, of her and her child's liberty interest in not being separated, based on the defendants' seizure of Joshua, without prior notice to her in Illinois and without exigent circumstances, pursuant to the defaultorder entered in New Mexico.

B. No Clearly Established Law

We turn next to the second part of the analysis of the defendants' claim of qualified immunity: whether clearly established law prohibited the defendants' conduct. Katz, 121 S.Ct. at 2156; Anderson v. Creighton, 483 U.S. 635, 640 (1987). To show this, a plaintiff may point to closely analogous cases establishing that the conduct is unlawful, or demonstrate that the violation is so obvious that a reasonable state actor would know that what he is doing violates the Constitution. See Siebert v. Severino, 256 F.3d 648, 654-55 (7th Cir. 2001); Brokaw, 235 F.3d at 1022; Vickery v. Jones, 100 F.3d 1334, 1339 (7th Cir. 1996).

Morrell contends that it was clearly established that due process requires notice and an opportunity to be heard be fore state actors may interfere with a mother's liberty interest in her child. The statement of the right at this level of generality, however, is of little help in determining the reasonableness of the defendants' conduct. See Anderson, 483 U.S. at 639; Wilson, 526 U.S. at 614-15. The appropriate question is whether it would be clear to reasonable officials in the defendants' position that enforcing the New Mexico court's order without prior notice or an opportunity to be heard in Illinois was unconstitutional. See Katz, 121 S. Ct. at 2156; Anderson, 483 U.S. at 639; Wilson, 526 U.S. at 615.

With regard to the procedures followed

in Illinois, Assistant State's Attorney Mock concluded that he was required to enforce the order without notice to Morrell, based on his reading of the Illinois UCCJA. As we noted above, wedisagree with his conclusion about Illinois law. But Morrell has not identified, and we have been unable to find, any authoritative cases considering analogous circumstances that hold that pre-deprivation notice and an opportunity to be heard is required as a matter of constitutional due process before a state may enforce another state's custody order. As we noted earlier, cases concerning the extra-territorial effect of a state's judgment or defining the due process limits of a state's jurisdiction over non-residents (Williams v. North Carolina, 325 U.S. 226 (1945), for example), do not speak to the procedures that must be employed in a state asked to enforce an out-of-state order, and do not hold that pre-enforcement notice and hearing is always required. And we do not think that the Illinois judge's denial of Howell's emergency petition for a body attachment compels a different conclusion. Mock had no knowledge of the basis for the judge's denial, and the judge's failure to issue an order was not obviously inconsistent with enforcement of the New Mexico order, given Mock's interpretation that an order from an Illinois judge was not required.

Morrell also contends that the order was, on its face, a "constitutional abomination," and so it should have been obvious to the defendants that it could not be enforced. The only alleged procedural deficiency apparent from the face of the order was the fact that it was entered ex parte after Morrell failed to appear the day after personal service. Morrell has pointed to no cases holding that a single day's notice is, under these circumstances, constitutionally inadequate, and given the court's finding (recited in the order) that Morrell "has intentionally been avoiding service of process," we do not think that notice was obviously infirm.

Finally, Morrell contends that the sheriff's deputies should have recognized that the order could not properly be enforced, based on information they learned when they were shown copies of the Indiana pleadings after they arrived

at Morrell's home, specifically, that another paternity action had been instituted by Morrell in Indiana. According to Morrell, they should have known that the New Mexico order was no longer operative because the order recited that the court relinquished jurisdiction once another parentage determination was undertaken:

If [a] parentage determination is undertaken in So. Carolina or in any other state, New Mexico relinquishes jurisdiction to such other state to determine custody, visitation and child support issues.

Morrell's interpretation of the legal effect of the filing of the Indiana paternity action is a reasonable one, but not the only reasonable one. At Morrell's home, the officers were shown pleadings from the Indiana action, but there was no order or other indication that the Indiana court had asserted jurisdiction. (Indeed, the officers were shown a motion to dismiss that was pending in Indiana based on New Mexico's prior assertion of jurisdiction.) Morrell's lawyer told the officers that the Indiana paternity action "superceded" the New Mexico action, but the officers were not required to rely on the lawyer's conclusion about the legal effect of the initiation of proceedings in Indiana. See Marks v. Carmody, 234 F.3d 1006, 1010 (7th Cir. 2000) ("We are aware of no rule that requires police officers to accept the legal arguments offered by a suspect's attorney."). This is particularly true in light of the fact that Assistant State's Attorney DeVriendt had already made the officers aware of the Indiana action, and specifically advised them that the New Mexico order was the operative one because it was the only one that was filed in Illinois. See Davis v. Zirkelbach, 149 F.3d 614, 620-21 (7th Cir. 1998) (police officers who relied on specific advice of attorney were entitled to qualified immunity when the advice was unequivocal and closely tailored to the particular facts, the attorney was the one responsible for rendering such advice, and the police acted promptly upon receiving the advice).

We conclude, therefore, that all defendants are entitled to qualified

immunity. Because of our conclusion on the issue of qualified immunity, we need not reach the sheriff's deputies' alternate argument that they were entitled to absolute immunity.

III. CONCLUSION

We are not unmoved by the circumstances presented by this case, and we share Morrell's concerns about the wisdom of authorizing an infant's separation from his mother and removal from the state by someone whom the child has never seen, apparently based on nothing more than the man's assertions that he, and not the mother's husband, was the child's father. Much of our concern is based on the procedures used here, but as we have said, it was not clearly established that the procedures were constitutionally infirm. Therefore, although Morrell has stated a claim for deprivation, without due process, of a protected liberty interest, we hold that the defendants' conduct in seizing her child was not contrary to clearly established law and therefore Affirm the judgment of the district court.

FOOTNOTES

/1 Morrell also asserts in a conclusory fashion that the seizure of Joshua violated the Fourth Amendment. Because the argument is not developed, it is waived. See Williams v. Gen. Elec. Capital Auto Lease, 159 F.3d 266, 274 (7th Cir. 1998); United States v. South, 28 F.3d 619, 629 (7th Cir. 1994).

/2 The "local law" governing recognition and enforcement in Illinois of custody determinations of other states is the Uniform Child Custody Jurisdiction Act (UCCJA), 750 Ill. Comp. Stat. 35/1, et seq., the requirements of which we will later address.

/3 Of course, jurisdiction is the only issue preserved when a defendant fails to appear, and if the defendant loses on the question of jurisdiction in a collateral attack, the decision on the merits is res judicata. See Elite Erectors, Inc., 212 F.3d at 1034-35; County of Cook, 167 F.3d at 388. Therefore, if jurisdiction is proper in the rendering court, little is to be gained by failing to appear and suffering a default.

/4 Griffin distinguished between judgments entered with adequate prior notice and hearing (as was the case in Endicott) and those entered without

those prejudgment procedures (which could not be enforced). Griffin, 327 U.S. at 233-34.

/5 We accept, for purposes of this discussion, the defendants' assertion that the New Mexico order is a "custody determination" subject to the UCCJA. See 750 Ill. Comp. Stat. 35/3.02 (defining "custody determination"); see also Pena v. Mattox, 84 F.3d 894, 899 (7th Cir. 1996) (noting courts' disagreement about whether a decision in a paternity action is subject to the uniform act). The parties do not make anything of the distinction between custody "judgments" and "decrees," so we will ignore this difference, as well. Compare 750 Ill. Comp. Stat. 35/16(a) with Unif. Child Cust. Jur. Act sec.15(a), 9 U.L.A. 616 (1999).

/6 In this context, "jurisdiction" refers to the necessary connections, specified by the statute, between the state and the controversy. See 750 Ill. Comp. Stat. 35/4; Levy v. Levy, 434 N.E.2d 400, 403 (Ill. App. Ct. 1982). We note that federal law follows the same approach as the UCCJA, requiring that states afford full faith and credit to those custody determinations made by a state having certain specified connections with the child or controversy. See Parental Kidnapping Prevention Act (PKPA), 28 U.S.C. sec. 1738A. Recognition of another state's order, under the UCCJA, is also limited to those determinations made after prejudgment notice to out-of-state parents and other specified parties. See Unif. Child Cust. Jur. Act sec. 13 cmt., 9 U.L.A. 13. The minimal notice to out-of-state parties is 10 days in Illinois, 750 Ill. Comp. Stat. 35/6, and (at the time the order was entered in this case) 20 days in New Mexico. N.M. Stat. Ann. 40-10-6(a) (replaced by Unif. Child Cust. Jur. & Enf. Act (UCCJEA), N.M. Stat. Ann. 40-10A-108, effective July 1, 2001). Compare PKPA, 28 U.S.C. sec. 1738A(e) (requiring reasonable notice).

/7 By contrast, the more recent Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) provides a streamlined enforcement procedure whereby notice of registration is sent to certain interested parties, and the out-of-state order confirmed as a matter of law if those parties entitled to notice do not contest registration within a specified period. See Unif. Child Cust. Jur. & Enf. Act sec. 305, 9 U.L.A. 692-93 (1999). Illinois has not enacted the UCCJEA.