# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 02-4187

NATASHA A. DUNN, individually, and KATIA S. DUNN,
a minor by her parent and next friend,
Natasha A. Dunn,

*Plaintiffs-Appellants*,

*v.*

CITY OF ELGIN, ILLINOIS, JASON A. LENTZ,
KEITH B. CHRASTKA, and MONA S. MCKINLEY,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 3787—**James Zagel**, *Judge.*

———————

ARGUED SEPTEMBER 26, 2003—DECIDED OCTOBER 20, 2003

———————

Before FLAUM, *Chief Judge*, and BAUER and MANION,
*Circuit Judges*.

FLAUM, *Chief Judge*. In February 2000 fifteen-month-old
Katia Dunn was seized by City of Elgin police officers acting
pursuant to an out-of-state custody order. Katia and her
mother, Natasha Dunn, brought suit against the City of
Elgin and the officers in the district court alleging that the
seizure violated 42 U.S.C. § 1983 and caused serious

emotional distress. The district court granted the Defendants summary judgment on all counts, and Plaintiffs now appeal. For the reasons stated herein, we affirm the district court's grant of summary judgment.

## I. BACKGROUND

On December 7, 1996, Natasha and Christian Dunn were married in North Carolina. Less than two years later, Christian abandoned Natasha while she was pregnant with his child. Natasha gave birth to Katia Dunn in November 1998. Because Christian failed to provide support for Natasha or Katia, they moved from North Carolina to Illinois to be closer to Natasha's parents.

Prior to leaving North Carolina, Natasha and Christian appeared in a North Carolina court to adjudicate Katia's custody. The North Carolina court entered an order providing that Christian would receive visitation during Easter, Christmas, and the summer. Christian was also ordered to pay child support and contribute to Katia's medical expenses. Furthermore, the order stated that the North Carolina court would retain jurisdiction over future custody determinations.

Christian failed to pay child support or medical expenses for Katia. Christian also did not appear for his first visitation during Easter 1999. Natasha filed for divorce in Illinois in December 1999, and refused to allow Christian to see Katia when he came to Illinois that Christmas. As a result, Christian filed a motion in North Carolina seeking sole legal and physical custody of Katia.

Natasha received notice of Christian's motion in January 2000. She retained a North Carolina attorney for the sole purpose of obtaining a continuance and did not attend the hearing on February 2, 2000. The North Carolina court denied Natasha's motion for a continuance and granted

Christian temporary exclusive care, custody, and control of Katia. The court's order contained the judge's signature, the date, and a file stamp for Rowan County, North Carolina. It directed any and all law enforcement officers to serve and render any possible assistance to aid and assist Christian in locating the minor child and delivering custody to Christian.

Early on the morning of February 6, 2000, Christian went to the City of Elgin police department. Christian showed the North Carolina order to Sergeant Mona McKinley. The order displayed no sign of having been filed in an Illinois court. In fact, Christian did not file the North Carolina order in an Illinois court because he did not want Illinois to assert jurisdiction. After examining the order, Sergeant McKinley informed Christian that the Elgin police could not enforce the order. Sergeant McKinley also stated that the police would not physically remove the child from the home but that they could act in a peacekeeping capacity. Sergeant McKinley then dispatched two officers to provide "peace-keeping standby service" for the child custody exchange.

Pursuant to Sergeant McKinley's request, City of Elgin Police Officers Keith Chrastka and Jason Lentz reported to Natasha Dunn's home in Illinois. Officer Chrastka examined the court order, realized it was not issued by an Illinois court, and suspected it might not be enforceable. Despite their instructions to provide standby service, Officers Chrastka and Lentz told Christian to wait in the driveway while they proceeded to the house. The officers repeatedly rang the doorbell and pounded on the door. When Natasha came to the door, the officers told her that they were there to take Katia pursuant to a North Carolina custody order. Natasha was told that if she refused to hand Katia to the officers, they would take Katia from her. Although Natasha told the officers that they could not enforce an out-of-state order, Officer Chrastka replied that they were going to do it. Officer Chrastka further stated that

there was nothing Natasha could do to prevent Katia from being taken. At that point, Officer Chrastka reached out and took Katia. Officer Chratska carried Katia outside and gave her to Christian, who then drove away.

City of Elgin police officers are told during training that standby service requires officers to keep the peace but to not take any other actions. Furthermore, Standard Operation Procedure (S.O.P.) Number 74.2 states that Elgin police officers will not generally serve or enforce documents of civil process and that civil process is typically to be referred to the Sheriff's Department. All S.O.P.s were reviewed by all Elgin officers during training prior to February 2000. Sergeant McKinley understood S.O.P. 74.2 to mean that Elgin police officers should not serve or enforce process documents. Officers Chratska and Lentz also understood that Elgin officers generally do not enforce civil documents.

Natasha brought suit in the district court on her own behalf and on behalf of Katia against the City of Elgin and Officers Jason Lentz, Keith Chrastka, and Mona McKinley individually and in their official capacities. Plaintiffs sought relief under 42 U.S.C. § 1983 and Illinois law on the basis that Defendants violated their constitutional rights and caused them severe emotional distress. The district court granted the Defendants summary judgment on all counts. Plaintiffs now appeal the district court's grant of summary judgment.

## II. DISCUSSION

Plaintiffs challenge the district court's grant of summary judgment on three grounds. First, Plaintiffs allege that the district court erred in finding that the Plaintiffs could not show that the City of Elgin violated 42 U.S.C. § 1983 by failing to train its officers. Second, Plaintiffs allege that the district court erred in finding that the officers were entitled to immunity from prosecution. Finally, Plaintiffs allege that

the district court erred in dismissing their intentional infliction of emotional distress claim based upon the finding that the Defendants' conduct did not amount to extreme and outrageous behavior.

We review a district court's grant of summary judgment *de novo*. *See Dykema v. Skoumal*, 261 F.3d 701, 704 (7th Cir. 2001). In doing so, we view the facts in the light most favorable to the non-moving party. *See id.* A grant of summary judgment is proper if there no genuine issue as to any material fact such that the moving party is entitled to a judgment as a matter of law. *Tesch v. County of Green Lake*, 157 F.3d 465, 471 (7th Cir. 1998).

### A. Section 1983

The Plaintiffs first challenge the district court's finding that the City of Elgin is not liable under § 1983 because there was no pattern of constitutional violations. We agree that Plaintiffs were not required to prove a pattern of constitutional violations, as the district court held. However, Plaintiffs' § 1983 claim still fails because they did not prove that the City of Elgin failed to adequately train its officers.

A municipality can be found liable under § 1983 if the municipality itself causes the constitutional violation. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). One example of this is where the municipality fails to provide adequate police training. However, "inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989). Deliberate indifference may be shown in one of two ways. First, a municipality shows deliberate indifference when it fails to train its employees to handle a recurring situation that presents an obvious potential for a con-

stitutional violation and this failure to train results in a constitutional violation. *See Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 409, 117 S. Ct. 1382, 137 L. Ed. 2d. 626 (1997); *Robles v. City of Fort Wayne*, 113 F.3d 732, 735 (7th Cir. 1997). Second, a municipality shows deliberate indifference if it fails to provide further training after learning of a pattern of constitutional violations by the police. *See Palmquist v. Selvik*, 111 F.3d 1332, 1346 (7th Cir. 1997).

Plaintiffs contend that the City of Elgin showed deliberate indifference by failing to provide any training regarding standby service. They argue that because child custody disputes implicate protected constitutional rights, the City had a responsibility to instruct its officers on how to proceed with regard to custody orders. However, Plaintiffs' argument cannot succeed because the City did adequately train its officers regarding standby service. First of all, the words "standby service" could arguably be considered clear on their face. If an officer is charged with merely standing by for peacekeeping purposes, extensive training should not be needed to educate the officer that he is not supposed to actively enforce orders. Secondly, the officers were instructed in field training that standby service requires officers to keep the peace but not take any other actions. Moreover, S.O.P. 74.2 informed officers that civil orders generally should not be served or enforced by Elgin officers. All of the officers in this case received training on S.O.P.s, including S.O.P. 74.2, prior to February 6, 2000.

The fact that two police officers did not follow the policy set forth by the City of Elgin is not enough to prove deliberate indifference by the City. Rather, Plaintiffs had to show that the City was aware that unless further training was given the officers would undermine the constitutional rights of others. *See Williams v. Heavener*, 217 F.3d 529, 532 (7th Cir. 2000). There is no evidence to support this conclusion, and therefore Plaintiffs cannot proceed against the City

under § 1983.

### B.  Immunity

Plaintiffs also challenge the district court's finding that Officers Chrastka, Lentz and McKinley are entitled to absolute immunity from Plaintiffs' § 1983 claims. For the reasons stated below, we hold that the officers are not shielded by absolute immunity because they were following an order that was facially invalid. However, we also find that the Defendants are entitled to qualified immunity because the unconstitutional nature of their actions was not clearly established prior to this case.

Both absolute and qualified immunity provide immunity from suit as well as immunity from liability. Absolute immunity protects "[n]on-judicial officials whose official duties have an integral relationship with the judicial process." *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1238 (7th Cir. 1986). Absolute immunity is often described as "quasi-judicial" immunity, because it derives from the immunity granted to judicial decision-making. *See id.*; *see also Richman v. Sheahan*, 270 F.3d 430, 437 (7th Cir. 2001) ("absolute immunity is not primarily to protect the enforcement function performed by the deputies, but rather to protect the judicial decision-making function"). Because judges are not liable for their decisions, it is only reasonable to also immunize those "acting pursuant to an official court order" or who are enforcing "a validly entered judgment." *Henry*, 808 F.2d at 1238. Qualified immunity protects governmental officers performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). Unlike absolute immunity, qualified immunity will not protect "knowingly unlawful or plainly incompetent acts." *Richman*, 270 F.3d at 438.

### 1. Absolute Immunity

In this case, the district court found that the officers were protected by absolute immunity because the order did not in any way appear incomplete or invalid on its face and therefore the defendants' only role was to follow the direction of the order. The Defendants argue that the district court's decision was correct because the order contained a judge's signature, a date, and a North Carolina file stamp as well as the order directing law enforcement officers to assist Christian in gaining custody. We disagree. The absence of any indication that the custody order had been filed in an Illinois court was enough to render it facially invalid.

It is axiomatic in our system of government that a state judge cannot order an out-of-state police officer to enforce its decisions. Although the Full Faith and Credit Clause requires that states give effect to the judgments of sister states, it does not require that states "adopt the practices of other States regarding the time, manner, and mechanisms for enforcing judgments." *Baker by Thomas v. General Motors Corp.*, 522 U.S. 222, 235, 118 S. Ct. 657, 139 L. Ed. 2d 580 (1998). Rather, the "local law of the forum determines the methods by which a judgment of another state is enforced." Restatement (Second) of Conflict of Laws § 99 (1971). Therefore, the proper enforcement of a North Carolina order in Illinois is governed by Illinois law.

Under Illinois law, foreign judgments do not become enforceable until they have been filed with an Illinois court. *See* 735 Ill. Comp. Stat. 5/12-652 (1992); 750 Ill. Comp. Stat. 5/511(c) (1999). Illinois courts have explicitly held that a custody order issued by another state is not enforceable in Illinois until a certified copy of the judgment is filed with an Illinois circuit court. *See Gasaway v. Gasaway*, 616 N.E.2d 610, 613, 246 Ill. App. 3d 531 (Ill. App. Ct. 1993); *see also In re Marriage of Mauro*, 543 N.E.2d 856, 858, 187 Ill. App. 3d 794 (Ill. App. Ct. 1989).

Here, Christian chose not to file the North Carolina custody order in an Illinois court hoping to prevent Illinois from asserting jurisdiction. This may have been logical, considering that Illinois possibly had a superior jurisdictional claim under the Uniform Child Custody Act. *See* 750 Ill. Comp. Stat. 35/3.04 (1979); 750 Ill. Comp. Stat. 35/4 (1981). However, this also rendered the North Carolina order unenforceable in Illinois. Because the City of Elgin officers were not acting pursuant to an enforceable order, they cannot receive absolute immunity.

Although the Defendants are concerned this approach requires police officers to act as appellate courts, reviewing the legal validity of court orders before acting on them, our limited holding requires no such thing. Illinois police officers are simply required to look for some indicia of authority from an Illinois court before enforcing an order. Orders entered by an Illinois judge or marked with an Illinois file stamp are sufficient to meet this requirement. The officers' failure to perform even this minimal step to ensure that they had judicial authority, however, means that they cannot now claim quasi-judicial immunity.

### 2.  Qualified Immunity

Even when they are not protected by absolute immunity, law enforcement officers typically receive qualified immunity for conduct performed within the scope of their official duties. *See Richman v. Sheahan*, 270 F.3d 430, 434 (7th Cir. 2001). To determine whether qualified immunity is appropriate in a § 1983 case, the court must decide: (1) whether the plaintiff has shown a violation of her constitutional rights, and, if so, (2) whether those constitutional rights were clearly established at the time of the violation, "such that a reasonable official would understand that what he was doing violates those rights." *See Morrell v. Mock*, 270 F.3d 1090, 1094 (7th Cir. 2001).

Plaintiffs claim a violation of their First, Fourth, and Fourteenth Amendment rights. Plaintiffs' First Amendment claim is without merit and need not be further addressed. Plaintiffs' Fourteenth Amendment claim is based upon the assertion that due process required that Natasha receive notice and an opportunity to be heard in an Illinois court before Katia could be seized pursuant to an out-of-state default order. This is in accord with our decision in *Morrell v. Mock*, 270 F.3d 1090, 1100-01 (7th Cir. 2001). However, *Morrell* also determined that this principle was not clearly established as late as 2001, and therefore it would not have been clearly established in 2000 when Katia was seized. *See id.*

Plaintiffs' Fourth Amendment claim is worthy of more extensive discussion. When determining whether a police officer's conduct violates the Fourth Amendment, we must determine: (1) whether the conduct constitutes a search or seizure; and, if so, (2) whether the search or seizure was unreasonable. *See Donovan v. City of Milwaukee*, 17 F.3d 944, 948 (7th Cir. 1994). For the purposes of this appeal, Defendants have admitted that the officers' conduct constituted a seizure. The Defendants argue, however, that a seizure pursuant to a court order is *per se* reasonable. Since we have already decided that the seizure was not pursuant to an enforceable court order, we therefore must decide whether a seizure pursuant to an out-of-state court order that bears no seal of approval from the officers' jurisdiction is reasonable.

Defendants make much of the fact that their method of enforcing the order was appropriate. For example, they reported to Plaintiffs' house in full uniform and marked squad cars, showed her the order, provided her with the North Carolina court dates, and allowed her to telephone her mother. However, the question at issue is not whether the method of enforcement was reasonable. Rather, the question is whether it was reasonable for the police officers to believe they had the authority to enforce this out-of-state

court order at all. *Cf. Illinois v. Rodriguez*, 497 U.S. 177, 185, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990) (commenting that the constitutionality of a search or seizure pursuant to an invalid warrant is determined by examining the objective reasonableness of the officer's belief that the warrant was valid).

We conclude that it was not objectively reasonable for the police officers in this case to believe they had the authority to enforce the North Carolina order. Immediately upon viewing the order, Sergeant McKinley realized that the Elgin police could not enforce the order and that they could not physically remove Katia from her home. She therefore dispatched two officers solely for "peacekeeping standby service." Having been dispatched solely for standby service, Officers Chrastka and Lentz then proceeded in a manner inconsistent with standing by. They ordered Christian to stay in the driveway while they went inside Natasha's house and told her that they were going to enforce the custody order and that there was nothing she could do to stop them. They informed Natasha that she could either give the officers her child or they would take her child. Then they physically took Katia from her mother.

Seizures, especially seizures of young children, should not be undertaken lightly. In this case, Officers Chrastka and Lentz knew their supervisor authorized only peacekeeping standby service. They further knew that they were acting pursuant to an out-of-state order bearing no indication of Illinois authority. At least one of the officers suspected that the order was not enforceable in Illinois at all. Both officers knew that civil orders should not be enforced by Elgin officers unless a supervisor approved such enforcement. Neither officer had ever been involved with the enforcement of an out-of-state order in the past. On these facts, it was objectively unreasonable for the officers to believe that they had the authority to physically seize a fifteen-month-old

child without seeking any further guidance or instruction from superiors.

It is true that, as we stated in *Pasiewicz v. Lake County Forest Preserve District*, the "violation of a state statute is not a *per se* violation of the federal Constitution." 270 F.3d 520, 526 (7th Cir. 2001). It is also true that an officer acting outside of his authority is not *per se* acting unreasonably. *Id.* at 527. But the case at issue is distinguishable from *Pasiewicz*. In *Pasiewicz*, a forest preserve police officer made an arrest based upon probable cause but the Defendant claimed it violated the Fourth Amendment because the arrest took place outside of forest preserve territory. *See id.* We start by noting that it is unclear in *Pasiewicz* that a statutory violation even occurred, as forest preserve officers are empowered to make arrests "in aid of the regular police force," and in *Pasiewicz* the forest preserve police had first called the regular police force to inform them of the arrest and then brought the defendant to that police station. *Id.* at 526. But even assuming that the forest preserve officers were acting outside of their jurisdiction, as the Court assumed for the purposes of the opinion, there are still important differences between the cases. First, *Pasiewicz* involved the jurisdiction of officers acting between political subdivisions of the same state, and therefore did not implicate the federalism issues that arise when one state orders the officers of another state to act. More importantly, however, is the factual context of the seizure. In *Pasiewicz*, the officers arrested an adult on a public indecency charge, knowing that any restraint was likely to be short and that the seized person would have the chance to defend himself in court.

The case at issue presents a very different factual scenario. When Officers Chrastka and Lentz acted outside of their authority, they seized an infant. Infants are particularly vulnerable and cannot act to defend themselves.

Moreover, the Officers gave the infant to a man whom they did not know pursuant to a court order that they did not fully read. (Officer Chrastka merely "thumbed through the order reading the last page, while Officer Lentz read "a couple" of paragraphs of the eight-page order.) Even though the interference with Natasha's custody was intended to be temporary, "we cannot ignore the not insubstantial risk that once physical custody is erroneously transferred, it may never be regained." *Morrell v. Mock*, 270 F.3d 1090, 1098 (7th Cir. 2001) (*citing* Unif. Child Cust. Jur. Act, prefatory note, 9 U.L.A. 262, 264 (1999) (estimating that as many as 100,000 children are kidnapped by a parent annually)).

As was stated in Pasiewicz, different factual scenarios will weigh differently "on the scales of reasonableness." *Pasiewicz*, 270 F.3d at 527. It is not merely the violation of a state statute or the fact that the officers were acting outside of their authority that motivates our conclusion in this case; it is also the fact that in doing so the officers seized a child without probable cause or exigent circumstances and gave the child to a third-party. All of these factors lead us to find that in this case the officers were objectively unreasonable.

Given that the officers' conduct violated Plaintiffs' Fourth Amendment rights, the next question becomes whether those rights were clearly established at the time of the violation. Although it was objectively unreasonable for the police officers to believe they had authority to seize a child pursuant to an out-of-state order, we cannot say that the unconstitutionality of this action was clearly established when Katia was seized. It may have been clearly established that such conduct violated Illinois law and the standard operating procedures for the City of Elgin Police Department, but Plaintiffs must also show that the conduct was so severe that "a reasonable person would have known of the unconstitutionality of the conduct at issue." *Brokaw*

*v. Mercer County*, 235 F.3d 1000, 1022 (7th Cir. 2000). This requires either that the plaintiff point to closely analogous cases, *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987), or prove that the right is "so clear. . . that no one thought it worthwhile to litigate the issue." *Brokaw*, 235 F.3d at 1022. In both cases the plaintiff must do more than merely prove that a general right, such as the right to be free from unreasonable seizures, was clearly established. *See Anderson*, 483 U.S. at 639, 639-40, *Morrell v. Mock*, 270 F.3d 1090, 1100 (7th Cir. 2001).

Plaintiffs have not met this burden. Plaintiffs have pointed to no cases where the enforcement of an out-of-state custody order in violation of a state statute was found to be a constitutional violation. We have been able to find only one case that holds that ignoring the statutory requirement that a custody order be signed by the court from the proper jurisdiction violates the Fourth Amendment, and that case was decided three months after the conduct at issue in this case. *Wooley v. City of Baton Rouge*, 211 F.3d 913, 926-27 (5th Cir. 2000). Cases concerning the extra-territorial effect of a court's order do not speak to the constitutionality of a police officer's choice to enforce an out-of-state order. While "it is not necessary that [the plaintiff] present a case 'on all fours' with this case in order to meet her burden of showing that the law as to this issue was clearly established," a "paucity" of cases will often show that the defendants were not on notice that their conduct violated that constitution. *Montville v. Lewis*, 87 F.3d 900, 902-03 (7th Cir. 1996).

Considering the circuit split that existed regarding whether an officer may act reasonably when acting beyond his or her jurisdiction, *compare Abbott v. City of Crocker*, 30 F.3d 994, 997 (8th Cir. 1994), *with Ross v. Neff*, 905 F.2d 1349, 1354 (10th Cir. 1990), we also cannot say that the absence of cases on point is due to the obviousness of the constitutional violation. Because Plaintiffs have not shown that it was clearly established by February 2000 that

seizing a child pursuant to an out-of-state order could constitute a violation of the Fourth Amendment, the officers are entitled to qualified immunity on that claim.

We conclude, therefore that the Defendants are entitled to qualified immunity from Plaintiffs' First, Fourth, and Fourteenth Amendment claims.

### C.  Intentional Infliction of Emotional Distress

In addition to the § 1983 claims, Plaintiffs also sued the Defendants under the state law tort of intentional infliction of emotional distress. In order to state a claim for intentional infliction of emotional distress, the plaintiff must show that: "(1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended that his conduct should inflict severe emotional distress, or knew that there was a high probability that his conduct would cause severe emotional distress; (3) the defendant's conduct in fact caused severe emotional distress." *Doe v. Calumet City*, 641 N.E.2d 498, 506, 161 Ill.2d 374 (1994). The nature of the defendant's conduct "must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized community." *Feltmeier v. Feltmeier*, 2003 WL 22145661, at *6 (Ill. Sept. 18, 2003).

It is undisputed that Officers Chrastka and Lentz did not swear, yell at, or touch Natasha when enforcing the North Carolina order. It is also undisputed that the officers gave Natasha the court order, explained it to her, wrote down the North Carolina court date for her, and allowed her to call her mother. Although the officers were unreasonable in their belief that they had authority to enforce the court order, this represents negligent or reckless conduct and does not alone amount to intentionally extreme and outrageous conduct. Furthermore, separating a parent from her child is not *per se* extreme and outrageous behavior. *See Franciski v. University of Chicago Hosps.*, 338 F.3d 765, 770

(7th Cir. 2003) (holding that a hospital did not act extremely or outrageously by refusing to allow parents to see their dying child during the last days of his life because the refusal was warranted by parents' misbehavior in the hospital). Because the officers acted politely and apparently in good faith, their conduct was not extreme and outrageous. *Cf. Doe*, 641 N.E.2d at 507 (holding that there was no extreme or outrageous conduct by police officers who arrived on scene and didn't act to help plaintiff's children, but that there was extreme and outrageous conduct by the police officer who refused to help plaintiff's children and also acted in a rude and demeaning manner toward the plaintiff). For the aforementioned reasons, we affirm the district court's grant of summary judgment to the Defendants on the count of intentional infliction of emotional distress.

### III. CONCLUSION

We are not unsympathetic to Natasha and Katia Dunn's claims that they suffered due to the unreasonable conduct of Officers Chrastka and Lentz, who took it upon themselves to enforce an order that Illinois law stated was unenforceable. However, we cannot say that this conduct was clearly established as a constitutional violation when the seizure took place. Accordingly, we affirm the district court's grant of summary judgment to the Defendants.

A true Copy:

      Teste:

                          _____

                          *Clerk of the United States Court of*
                          *Appeals for the Seventh Circuit*