## METROPOLITAN MILWAUKEE ASSOCIATION OF COMMERCE, Plaintiff,

v.

## MILWAUKEE COUNTY, Defendant.

### No. 01–C–0149.

United States District Court, E.D. Wisconsin.

Feb. 11, 2005.

---

Gordon Giampietro, Jonathan Levine, Milwaukee, WI, for Plaintiff.

Marianne Goldstein Robbins, Milwaukee, WI, for Defendant.

### *DECISION AND ORDER*

ADELMAN, District Judge.

Plaintiff Metropolitan Milwaukee Association of Commerce, an association of area businesses, challenges a Milwaukee County ordinance requiring certain County contractors to sign labor peace agreements with unions who seek to organize those of their employees who perform County-funded work. Plaintiff asserts that the ordinance is preempted by National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151, et seq., that it violates the Free Speech Clause of the First Amendment, and that it is unconstitutionally vague in violation of the Due Process clause of the Fourteenth Amendment. Before me now are the parties' cross-motions for summary judgment.

### I. BACKGROUND

Chapter 31, entitled "Responsibility of Certain County Contractors to Reduce the Likelihood of Labor Disputes," applies to contractors from whom the County purchases care, treatment or transportation services for the elderly or disabled, having an aggregate value of more than $250,000. Milwaukee County, Wis., Gen. Ordinances

("Ord.") § 31.02(a). The ordinance states that its purpose is to protect the County's interest in ensuring the uninterrupted delivery of County-funded services to vulnerable residents by preventing disruptions caused by labor disputes during labor organizing drives. *Id.* § 31.01.[1]

Chapter 31 requires a contractor to whom it applies, as a condition of doing business with the County, to agree to enter into a labor peace agreement with a union that: (1) seeks to organize the contractor's County-funded employees; and (2) requests such an agreement. *Id.* § 31.03(a). Under the ordinance, a labor peace agreement must provide that: (1) the contractor will not "express to employees false or misleading information that is intended to influence the determination of employee preference regarding union representation;" (2) the union will not "misrepresent to employees the facts and circumstances regarding their employment;" (3) the contractor will provide to the union a "list of the names, addresses and phone numbers of the employees" who are eligible for representation; (4) the contractor will afford the union reasonable "access to the workplace for the purpose of providing employees with information about the [union];" (5) disputes arising under the agreement will be arbitrated; and (6) the union will not engage in economic action against the employer, such as strikes, picketing or boycotting. *Id.* § 31.02(f)(1)-(6). The agreement must also include procedures for preventing the parties from coercing employees in selecting or not selecting a bargaining representative and prohibit them from requiring employees to "attend a meeting or event that is intended to influence [their] decision in selecting or not selecting a bargaining representative." *Id.* § 31.02(f)(7). The County may terminate contracts with contractors who refuse to sign an agreement or who are found by an arbitrator to have violated one. *Id.* § 31.05.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For a dispute to

---

1. The ordinance states:

It is the purpose of this section to protect the needs of County residents who receive human services from County-funded private employers and protect the proprietary interests of the County by requiring any private employer that receives substantial funding from Milwaukee County for the provision of human services to sign a labor peace agreement with any labor organization seeking to represent its employees and by requiring that any labor organization seeking to represent the workers of such an employer agrees to settle disputes during organizing campaigns without strikes or picketing.

This section is not enacted to provide an advantage to either labor or management during the conduct of a union organizing campaign, nor is it intended to enact or express any generally applicable policy regarding labor/management relations, or to regulate those relations in any way. It is intended only to protect the County's proprietary interest in certain narrowly prescribed circumstances where the County commits its economic resources and/or its related interests are put at risk by certain forms of labor/management conflict.

*Id.* § 31.01.

be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id.* For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, it is "not required to draw every conceivable inference from the record—only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991). When both parties have moved for summary judgment, both are required to show that no genuine issues of fact exist, taking the facts in the light most favorable to the party opposing each motion. If issues of fact exist, neither party is entitled to summary judgment. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt,* 700 F.2d 341, 349 (7th Cir.1983).

### III. PREEMPTION CLAIM

#### A. General Principles of Preemption

■■■■ Plaintiff argues that under the Supremacy Clause of the Constitution, U.S. Const. art. VI, cl. 2, the NLRA preempts Chapter 31. A federal statute may expressly or impliedly preempt state or local legislation. *Metro. Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 738, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985). In the absence of express preemption, to determine whether a federal statute preempts state or local legislation, a court must ascertain Congress's intent in enacting the federal statute. *Id.* Generally, courts will not imply preemption unless Congress clearly intended to occupy the field or the state or local regulation conflicts with the federal

statute or frustrates its purpose. *Id.* at 738, 747–48.

■■■ The NLRA contains no preemption provision, and courts have generally been reluctant to read into the law a congressional intent to preempt. *Bldg. & Constr. Trades Council of the Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.,* 507 U.S. 218, 224, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993) ("*Boston Harbor*"); *Colfax Corp. v. Ill. State Toll Highway Auth.,* 79 F.3d 631, 633 (7th Cir.1996). However, courts have determined that the NLRA preempts state and local regulation in two situations. "*Garmon* preemption" forbids state and local regulation of activities that § 7 of the Act protects, that § 8 makes an unfair labor practice or that the Act arguably protects or prohibits. *Boston Harbor,* 507 U.S. at 224–25, 113 S.Ct. 1190 (citing *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 244, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959)). "*Machinists* preemption" prohibits state and municipal regulation in areas that Congress intended to leave to the free play of economic forces. *Id.* at 225–26, 113 S.Ct. 1190 (quoting *Lodge 76, Int'l Assoc. of Machinists & Aerospace Workers v. Wis. Employment Relations Comm'n,* 427 U.S. 132, 140, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976)).

In arguing that the NLRA preempts Chapter 31, plaintiff does not make clear whether it has in mind *Garmon* or *Machinists* preemption or both (probably the last). In any case, the County responds that Chapter 31's purpose is to serve its proprietary interest in ensuring the efficient delivery of County-funded services to vulnerable County residents and not to regulate labor relations and, therefore, the ordinance is not subject to NLRA preemption.

■■■ When a state or local government takes action that affects labor relations but

does so for the purpose of serving its proprietary as opposed to regulatory interest, the action is not subject to NLRA preemption. *Boston Harbor,* 507 U.S. at 220–22, 232–33, 113 S.Ct. 1190. Two Supreme Court cases, *Wisconsin Department of Industry, Labor & Human Relations v. Gould, Inc.,* 475 U.S. 282, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986), and *Boston Harbor,* set the parameters for determining when governmental action affecting labor relations is proprietary and when it is regulatory. In *Gould,* the Supreme Court held that the NLRA preempted a state law debarring employers who repeatedly violated the NLRA from doing business with the state.[2] Although the state argued that the statute was not subject to preemption because it constituted market participation, the state conceded that the statute's purpose was to deter labor law violations and reward fidelity to the law, and the Court found that the statute "function[ed] unambiguously as a supplemental sanction for violations of the NLRA." *Gould,* 475 U.S. at 287–89, 106 S.Ct. 1057. The Court stated that the statute could not "even plausibly be defended as a legitimate response to state procurement constraints," and that "[t]he manifest purpose and inevitable effect of the debarment rule [was] to enforce the requirements of the NLRA." *Id.* at 291, 106 S.Ct. 1057. The Court therefore rejected the state's argument that the statute constituted market participation.

In *Boston Harbor,* the Court upheld the action of a state agency against a claim of NLRA preemption on the ground that the agency was acting as a market participant. There, the agency required bidders on a construction project to agree to sign a project labor agreement as a condition of receiving a contract. 507 U.S. at 220–22, 232–33, 113 S.Ct. 1190. The purpose of the requirement was to assure labor stability over the life of the project. *Id.* at 221–22, 113 S.Ct. 1190.[3] After recognizing that "[p]ermitting the States to participate freely in the marketplace is ... consistent with NLRA preemption principles," the Court found that the requirement was not preempted because "there [was] no question but that [the state agency] was attempting to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost," and because the requirement was "specifically tailored to one particular job." *Id.* at 230–32, 113 S.Ct. 1190. The Court also determined that the fact that the NLRA authorized private employers in the construction industry to enter into similar agreements indicated that Congress did not view such agreements as interfering with federal labor policy. *Id.* The Court further inferred that if Congress contemplated that private parties could enter into such agreements, Congress would not have intended to prohibit governmental bodies from entering into similar agreements when acting as market participants. *Id.*

Although *Gould* and *Boston Harbor* set the parameters for determining whether state or local action affecting labor rela-

---

2. The law at issue directed a state agency to maintain a list of persons and entities who violated the NLRA three times within a five-year period and prohibited the state from purchasing products manufactured or sold by such persons or entities. *Gould,* 475 U.S. at 283–84, 106 S.Ct. 1057.

3. Among other things, the agreement provided that one union would be the exclusive bargaining agent for all craft employees, specified methods for resolving labor-related disputes, required all employees to become union members within seven days of their employment, prohibited unions from striking for ten years, and required all contractors and subcontractors to agree to be bound by the agreement. *Boston Harbor,* 507 U.S. at 221–22, 113 S.Ct. 1190.

tions is proprietary or regulatory, neither establishes a method for determining whether an ordinance such as Chapter 31 is subject to . NLRA preemption. And Chapter 31 is sufficiently different from the statute in *Gould* and the project labor agreement in *Boston Harbor* such that neither *Gould* nor *Boston Harbor* dictates the outcome of the present case. In *Gould,* the state conceded that the purpose of the debarment law was to regulate labor relations, whereas in the present case, Milwaukee County strongly asserts that the purpose of Chapter 31 is to ensure the uninterrupted delivery of County-funded services. Chapter 31 also differs from the action in *Boston Harbor.* Chapter 31 is less clearly proprietary than was the action under review in *Boston Harbor,* and Congress has not explicitly authorized private entities to enter agreements of the type described in Chapter 31. Thus, Chapter 31 is neither clearly regulatory like the statute in *Gould,* nor as clearly proprietary as the action considered in *Boston Harbor.*

The Seventh Circuit has faced the proprietary/regulatory issue only once, in *Colfax Corp. v. Illinois State Toll Highway Authority,* 79 F.3d 631 (7th Cir.1996). Because the facts of *Colfax* were so similar to those of *Boston Harbor,* the court did not need to develop a test for distinguishing between proprietary and regulatory actions.[4] In *Colfax,* the court held that the NLRA did not preempt a state's decision to require bidders on a highway construction project to adhere to a project labor

agreement which, in turn, required the successful bidder to sign area-wide union collective bargaining agreements. *Id.* at 632–33, 635. Like the project labor agreement at issue in *Boston Harbor,* the *Colfax* agreement was designed to reduce delay in completion of the project as a result of labor unrest. *Id.* at 632–33. The court found the agreement similar to the agreement in *Boston Harbor,* except that the contractors had to sign area-wide collective bargaining agreements, not simply agreements limited to the work performed in connection with the highway project. *Id.* at 634–35. The court rejected the employer's argument that the state was secretly trying to regulate labor and held that, because as an objective matter it appeared that the state was attempting to keep labor peace in furtherance of its proprietary interests, the court would not "go behind the contract to determine whether the [state's] real, but secret, motive was to regulate labor." *Id.* at 635.

Because neither *Gould, Boston Harbor* nor *Colfax* establishes a method for distinguishing between proprietary and regulatory actions, and because all three cases are distinguishable from the present case, I will attempt to articulate a method for determining whether Chapter 31 is proprietary or regulatory. In articulating this method, my goal is to effectuate Congress's intent concerning the scope of the market participation exception to NLRA preemption. *See Metro. Life Ins. Co.,* 471 U.S. at 738.

---

4. In the present case, the Seventh Circuit previously considered the issue of justiciability but not of preemption. *See Metro. Milwaukee Ass'n of Commerce v. Milwaukee County,* 325 F.3d 879 (7th Cir.2003). Plaintiff argues that in that decision the Seventh Circuit instructed me to resolve the preemption issue based on the motives of the County supervisors and cites the court's statement that: "we remand with the suggestion that the district

court encourage the parties to develop facts underlying the County's motivation for enacting the ordinance." *Id.* at 884. I have followed the Seventh Circuit's suggestion and encouraged the parties to develop such facts, which they have done. However, I do not believe that in making this suggestion, the court intended to establish a test for how to resolve the case. I discuss this question at greater length later in the decision.

Plaintiff argues that to determine whether action is proprietary or regulatory I should focus on the subjective motives of the significant government actors—in this case, County legislators—and determine whether their motives were to regulate labor or to serve proprietary interests. However, almost every court that has addressed the question has held that the subjective motives of government actors are irrelevant to preemption analysis. *See Hotel Employees & Rest. Employees Union, Local 57 v. Sage Hospitality Res., LLC,* 390 F.3d 206, 216 n. 7 (3d Cir.2004) (stating that "[w]e do not believe, however, that *Boston Harbor* and its progeny require a factual investigation into the particular subjective motives of the relevant government agency"); *Chamber of Commerce of the United States v. Reich,* 74 F.3d 1322, 1335–36 (D.C.Cir.1996) (refusing to question President's motive for issuing executive order affecting labor); *New England Health Care Employees Union v. Rowland,* 221 F.Supp.2d 297, 327 n. 39 (D.Conn.2002) (citing *Colfax* and stating that evidence of subjective motive is not relevant to market participant exception to preemption); *Legal Aid Soc'y v. City of New York,* 114 F.Supp.2d 204, 237 (S.D.N.Y.2000) (stating that "the subjective motivation of a state actor is irrelevant to preemption analysis, which instead is guided by the objective effects of state action in relation to the federal scheme"). *But see Van–Go Transp. Co., Inc. v. New York City Bd. of Educ.,* 53 F.Supp.2d 278, 290–93 (E.D.N.Y.1999) (stating that, in NLRA preemption context, "motives do matter").

Although several courts have inquired into the "purpose" of a measure affecting labor,[5] *Chamber of Commerce of the Unit-* ed States v. Lockyer, 364 F.3d 1154, 1163 (9th Cir.2004); *Dillingham Constr. N.A., Inc. v. County of Sonoma,* 190 F.3d 1034, 1037–38 (9th Cir.1999); *Associated Builders & Contractors, Inc. v. City of Seward,* 966 F.2d 492, 496 (9th Cir.1992), they have determined purpose by drawing inferences from the language and/or scope of the legislation rather than by attempting to divine legislators' motives, *Lockyer,* 364 F.3d at 1163 (inferring purpose from statute's preamble); *Dillingham,* 190 F.3d at 1038 (inferring regulatory purpose from fact that statute applied to all public works contracts in state rather than a specific project); *City of Seward,* 966 F.2d at 496 (stating that objective circumstances showed that city was trying to further proprietary goals).

■ I agree with the majority of courts that have addressed the issue that I should not attempt to resolve the question of preemption by conducting an inquiry into legislators' motives. Courts generally do not make such inquiries. *See Grossbaum v. Indianapolis–Marion County Bldg. Auth.,* 100 F.3d 1287, 1292–94 (7th Cir.1996) (stating that courts probe governmental actors' motives only in a few types of cases such as those relating to Equal Protection, the Establishment Clause and Bills of Attainder, and explaining inherent difficulties in making such inquiries and judicial reluctance to do so); *see also DiMa Corp. v. Town of Hallie,* 185 F.3d 823, 829 (7th Cir.1999) (stating that a test based on subjective motives would be "an exercise in futility"); *City of Seward,* 966 F.2d at 500 (Wright, J., dissenting) (stating that in NLRA preemption context, evaluating a local government's motives is a "seemingly

---

5. Purpose differs from motive. An inquiry into purpose focuses on whether the law itself has any legitimate effect, whereas an inquiry into motive seeks to discover why a govern- ment actor wishes to enact or defeat proposed legislation. *See Grossbaum v. Indianapolis– Marion County Bldg. Auth.,* 100 F.3d 1287, 1292 n. 3 (7th Cir.1996).

impossible task and one which [the court has] traditionally avoided").[6] Further, it is doubtful that Congress intended the NLRA to preempt the action of one governmental body because its legislators harbored a regulatory motive but not the similar or identical action of another because its legislators had a proprietary motive. *See Legal Aid Soc'y,* 114 F.Supp.2d at 237 (recognizing that preemption test focusing on government's motive "would produce the anomalous result that the same actions, undertaken by different

state actors with different subjective motivations, would yield different results under NLRA preemption analysis").[7] Thus, because the applicable case law contains little support for resolving the question of NLRA preemption by inquiring into government actors' subjective motives and because it is unlikely that Congress intended courts to use such an approach, I will decline plaintiff's invitation to resolve the preemption issue in that fashion.[8]

▇ The Third Circuit has developed an approach to distinguishing proprietary

6. The difficulties inherent in courts' basing decisions on a government's motives are both theoretical and practical. Theoretically, because " '[w]e are governed by laws, not by the intentions of legislators,' " a court will not strike down an otherwise valid government action because its enactors harbored an illicit intent. *Grossbaum,* 100 F.3d at 1293 (citing *Conroy v. Aniskoff,* 507 U.S. 511, 519, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993), and *Church of the Lukumi Babalu Aye v. City of Hialeah,* 508 U.S. 520, 558–59, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993)). Practically, as the Court stated in *United States v. O'Brien*:

> Inquiries into [legislative] motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose. It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of [legislators] said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.

391 U.S. 367, 383–84, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (footnote omitted). *But see* Paul Brest, *Palmer v. Thompson: An Approach to the Problem of Unconstitutional Legislative Motive,* 1971 Sup.Ct. Rev. 95, 115–31 (suggesting approach for ascertaining legislative motive).

7. Indeed, under a preemption test in which motive was central, a governmental body could take the same action twice with different results depending on what the evidence disclosed concerning its motive. *See DiMa Corp.,* 185 F.3d at 829 (recognizing that if the court "struck down [a town] ordinance because of the improper motives of some Board members," the town might be able to immediately reenact the same ordinance but with the members all being careful to avoid stating their illegitimate motives).

8. Even if I were to focus on the County's motive, it is unclear how I would go about ascertaining it. For example, in the Equal Protection context, motive is a question of fact. *See Hunt v. Cromartie,* 526 U.S. 541, 549, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) (stating that "[t]he legislature's motivation is itself a factual question"). If motive is a question of fact, I would have to deny both parties' summary judgment motions because based on the record, the question of the County's motive for enacting Chapter 31 presents a genuine issue of material fact. *Compare* (DeBruin Dep. at 5) (testifying that as County supervisor, her "number one goal [in voting for Chapter 31] was to prevent [service disruptions caused by labor disputes] from ever happening again"), *with* (Zielinski Dep. Ex. 1) (copy of newspaper article in which County supervisor stated with reference to Chapter 31 that the County had "to make it easier for people to get organized"). Further, it is unclear whether I would need to ascertain the "predominant" motive of the County supervisors for enacting Chapter 31 or only that a regulatory or proprietary motive played some part in their decision.

from regulatory action that does not focus on a government's motive for passing a law or taking an action but on the purpose and effect of the action itself. Under the Third Circuit's approach, governmental action will be deemed proprietary if: (1) it serves to advance or preserve the government's proprietary interest in a project or transaction, as an investor, owner or financier; and (2) the scope of the funding condition is "specifically tailored" to the proprietary interest. *Sage*, 390 F.3d at 215–16. Thus, "if the funding condition does not serve, or sweeps more broadly than, a government agency's proprietary economic interest, it must submit to review under labor law preemption standards." *Id.* at 216. Because the Third Circuit's approach permits courts to distinguish proprietary from regulatory action based on objective factors and strikes an appropriate balance between Congress's intent to maintain uniformity in labor regulation and its intent to allow state and local governments to act as market participants, I conclude that I should use a comparable framework to address the proprietary/regulatory issue in the present case.

▮▮▮▮ Under this framework, I first determine whether the government has advanced a proprietary justification for its action. Assuming that the government has advanced a proprietary goal, I ask whether the government has offered a reasonable explanation as to how the action at issue serves that goal. To make this showing, the government is not required to prove that the action in question is typical of the actions of private entities.[9] It need only show that it has a reasonable basis for concluding that the challenged action will serve its proprietary interest. Further, the government's burden of making such a showing is not a heavy one, for state and local governments are allowed some freedom to act innovatively in the marketplace. *Compare Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 71, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (stating that "[a] City must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems.").[10]

9. Although a government's showing that its action is typical of the actions of similarly situated private entities would be strong evidence that its action is proprietary, it is unlikely that Congress intended to require state and local governments to make such a showing. This is so, first, because state and local governments often act in areas that private parties do not. For example, it is unlikely that any private entities contract for the delivery of transportation or other services to the elderly and disabled as Milwaukee County does, and if they do, it is unlikely that they deliver such services on a scale comparable to that of the County. Thus, it would probably be impossible for Milwaukee County to find a similarly situated private entity and therefore to show that its action is typical of the actions of such entities. It is unlikely that Congress intended to prevent state and local governments from devising solutions to their unique proprietary problems solely because the problems are unique. Second, even when there are private parties in the same position as the government, requiring the government to show that its action is typical of those parties would prevent it from devising innovative solutions to its proprietary problems. Again, it is unlikely that Congress would have intended this result. *Cf. Sage*, 390 F.3d at 216 n. 7 (concluding that *Boston Harbor* does not require "a survey of what private parties do in like circumstances").

10. Cases such as *Young* which relate to the constitutionality of legislation regarding adult-oriented businesses are instructive in the present case because, as here, the inquiry in such cases is whether legislation serves a permissible purpose. In the adult entertainment context, legislation is constitutional if it is targeted at the negative secondary effects of such businesses, such as increased crime and urban blight, rather than at the protected expression that occurs on the businesses' premises. *See generally City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002); *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct.

If the government can show that the action in question reasonably advances its proprietary goal, I must next determine whether the action is specifically tailored to the government's proprietary interest, i.e., whether the action is broader than necessary to serve such interest. However, because a state or local government is generally in a better position than a court to decide how broad a measure must be to serve its proprietary interest, the government's burden of establishing specific tailoring is not onerous. Nor must a government choose the most reasonable or the only reasonable means of furthering its proprietary interest. *See Legal Aid Soc'y,* 114 F.Supp.2d at 239–40 (citing *Cardinal Towing & Auto Repair, Inc. v. City of Bedford, Tex.,* 180 F.3d 686, 695–96 (5th Cir.1999), and *Associated Gen. Contractors of Am. v. Metro. Water Dist. of S. California,* 159 F.3d 1178, 1184 (9th Cir.1998)). However, government action that " 'addresse[s] employer conduct unrelated to the employer's performance of contractual obligations to the [Government]" is not specifically tailored. *Bldg. & Constr. Trades Dep't, AFL–CIO v. Allbaugh,* 295 F.3d 28, 36 (D.C.Cir.2002) (internal quotation marks and citation omitted, alterations

in original); *see also Reich,* 74 F.3d at 1338 (finding executive order preempted in part because it affected employees who did not provide goods and services to the government).[11]

The above test offers a principled and workable means of determining whether a governmental action affecting labor relations is proprietary or regulatory. If a government can justify an action as a reasonable way of addressing a proprietary problem, a court should not second-guess it. On the other hand, if the government cannot advance a reasonable proprietary justification for its action or if the action is broader than necessary to serve the government's proprietary interest, a court should consider the action to be regulatory. This approach strikes an appropriate balance between Congress's intent to maintain uniformity in labor regulation and to allow state and local governments to act as market participants.

## B. Application of Test to Chapter 31

Plaintiff does not dispute that Milwaukee County has a proprietary interest in ensuring that the delivery of County-funded services to vulnerable residents is not interrupted as the result of union orga-

---

925, 89 L.Ed.2d 29 (1986). Thus, governments must produce evidence that legislation is reasonably related to the goal of reducing negative secondary effects. However, their burden is not heavy. *See Alameda Books,* 535 U.S. at 451–52, 122 S.Ct. 1728 (Kennedy, J., concurring) (stating that "very little" evidence is required to establish a local government's purpose for enacting an ordinance); *see also DiMa Corp.,* 185 F.3d at 831 (permitting court to reject evidence contradicting that relied on by local government as long as other evidence supported government's conclusion). I also note that when assessing the purpose of an ordinance in the adult entertainment context, courts do not look at the subjective motives of legislators. *See, e.g., DiMa Corp.,* 185 F.3d at 828–29.

11. Some courts have equated the "specifically tailored" inquiry with the question of whether the governmental action was ad hoc or part of a general policy and have treated ad hoc actions as proprietary and actions taken pursuant to a policy as regulatory. *See, e.g., Van-Go Transp.,* 53 F.Supp.2d at 288. However, whether governmental action is taken on a case-by-case basis or pursuant to a general law that calls for a number of actions is not dispositive of whether the action is proprietary or regulatory. As long as the scope of the action does not exceed that reasonably necessary to achieve a permissible proprietary goal, the action is not preempted. *See Allbaugh,* 295 F.3d at 35–36 (stating that in the preemption context, there is no logical justification for distinguishing between ad hoc decision making and "blanket rules").

nizing.[12] Thus, I turn to the question of whether Chapter 31 reasonably serves the County's proprietary interest. I note first that private employers often enter into neutrality agreements like those required by Chapter 31 to reduce the likelihood that union organizing will disrupt their businesses. *See* Roger C. Hartley, *Non–Legislative Labor Law Reform and Pre–Recognition Labor Neutrality Agreements: The Newest Civil Rights Movement*, 22 Berkeley J. Emp. & Lab. L. 369, 390 n. 111 (2001) (discussing case of restaurant owner entering into neutrality agreement after picketing forced another restaurant to close); Richard M. Reice & Christopher Berner, *Unions Favor Card Check Recognition in Organizing but the NLRB May Rule, or Congress May Legislate, to Restrict this Strategy*, Nat'l L. J., January 10, 2005, at 17 (stating that neutrality agreements often "buy[ ] much needed labor peace"); Perkins Coie, *Organized Labor on the Move*, 4 Wash. Emp. L. Letter, at 2 (stating that employers often agree to neutrality agreements to avoid boycotts and demonstrations); *see also* Br. of Amici Curiae Allied Council of Senior Citizens et al. [R. 118] at 12 n. 4 (collecting newspaper articles describing business disruptions caused by union organizing).

Moreover, before enacting Chapter 31, the County held public hearings. At the hearings, witnesses testified that organizing aimed at employees of businesses providing County-funded services had delayed the delivery of such services. One witness testified that during an organizing campaign employers intimidated employees, causing them not to report for work and resulting in County buses running fifty minutes behind schedule. (Selky Aff. Ex. B at 3.) Another witness testified that during an organizing drive, "a lot of people experienced terrible [transportation] services and ... it totally disrupted our lives. Appointments were missed ... people sat waiting for more than an hour[,] on some occasions up to two hours ... and service was not good." (*Id.* at 4.) The County also presents statistics demonstrating a correlation between union organizing of County transportation service providers and the County's inability to fulfill elderly and disabled persons' requests for rides. (Aug. 15, 2001 Novak Aff. ¶ 4 & Ex. A.)[13] Additionally, a County supervisor testified that during the union organizing drives, she received "multiple calls from individuals who used the paratransit services who were no longer getting adequate service." (DeBruin Dep. at 25–28.)[14] Another su-

**12.** Chapter 31 states its proprietary purpose in its "purpose" section as quoted *supra* n. 1, as well as in the preamble to the resolution adopting Chapter 31. (Robbins Aff. [R. 111] Ex. A at 005027.)

**13.** Plaintiff objects to my considering the Novak Affidavit, arguing that the County did not produce related discovery materials. (Pl. Reply Br. [R. 123] at 26 n. 4.) However, plaintiff expresses its argument in extremely conclusory terms and, therefore, waives it. *See, e.g., Morrell v. Mock*, 270 F.3d 1090, 1095 n. 1 (7th Cir.2001). Moreover, at no time did plaintiff object to the adequacy of defendant's responses to its requests for related discovery.

**14.** Specifically, DeBruin testified that:

one woman in a wheelchair was left outside the west suburban YMCA in the summer sun for four hours waiting for a ride, and in order to reach a phone she would have to wheel herself up this short hill and go inside. And she was too afraid that she would miss her ride and be stuck another set of hours to do that, so she just sat and baked in the sun for four hours. And by the time somebody at the Y realized her status, she had problems with having to use the restroom, so she called me in tears.

I had another individual call me who was using a voice box machine so he could speak and it was hard to understand him because he cried through the conversation, but he was talking about missing his doc-

pervisor testified to the same effect. (Quindel Dep. at 54–55.)[15] Thus, the County had a reasonable basis for concluding that the risk of service disruption as the result of union organizing was sufficiently serious to justify taking action.[16]

Further, the County had a reasonable basis for concluding that requiring County contractors to enter into labor neutrality agreements would reduce the likelihood of such disruption. As discussed, private employers often enter into similar agreements to avoid potential disruption of their business. Further, labor neutrality agreements are designed to reduce intimidation of the type that apparently contributed to the disruption of County bus service.[17]

Plaintiff depreciates some of the evidence on which defendant relies and argues that other evidence calls into question

tor's appointment that he tried to get for a month-and-a-half because no one showed.

There were calls, a couple different calls from individuals who because their regular driver had been replaced, the new driver wasn't aware of their special needs and they either didn't meet their needs or felt that they were being harassed by an uncaring driver who didn't know. People got—people's appointment times were switched from when they'd be picked up. People would be told to wait several hours for a ride instead of the past history where they came within a fairly narrow window. There were whole bunches of problems. I got, I thought, a fair number of calls from people.

(DeBruin Dep. at 25–26.)

DeBruin further stated that she attributed these service disruptions to labor organizing campaigns

[b]ecause [the disruptions] happened right in the midst of the union organizing campaign and it happened multiple times. In addition to that pretty obvious logic there—I'm familiar enough with contentious campaigns that even with good intentions on both sides this kind of thing can happen. People get upset on both sides. And human beings—schedules get changed and people get—behave in different ways because they're under stress. And so what you end up getting is a disruption in the services on a fairly regular basis.

(Id. at 28.)

15. Quindel stated that he attributed these disruptions to labor organizing campaigns because the disruptions and the campaigns

[were] going on at the same time. We never had any incidents before. And once they worked out the labor agreement, then we never had a problem—I never had a report again. And [one of the contractors]

is in my district and a lot of the clients live in my district, and I never had a complaint afterwards.

(Quindel Dep. at 55.)

16. The County articulated these findings in the preamble to the resolution adopting Chapter 31. (Robins Aff. [R. 111] Ex. A, at 005027) (stating that the County found that there were "several previous instances in which [contractors providing human services on behalf of the County] have been involved in acrimonious labor disputes as a result of efforts taken by labor organizations to organize workers over employer opposition to unionization," and that "such labor disputes have resulted in the impediment or interruption of the delivery of human services to Milwaukee County's most vulnerable residents and/or a reduction in the quality of such services").

17. On this point, one supervisor testified as follows:

[A labor peace agreement] creates a format for the exchange of information and goals during an organizing dispute in a matter in which both sides, in my opinion, have pieces in which they—the ordinance has certain behaviors that we want both management and the union to adhere to. Lack of coercion, lack of intimidation, that would—if those types of behaviors are followed, you're still going to have an open debate about and free exchange of opinions as to whether or not there should be a union. But it would not be as likely to cause conflict if either side is restricted from being coercive or intimidating or demeaning ... or anything ... that would be likely to result in high conflict between the two.

(DeBruin Dep. at 56–57.)

the asserted connection between organizing and service disruptions. However, as stated, the County's burden of showing that its action reasonably serves its proprietary interest is not a heavy one, and the County has satisfied it. Where possible, courts should avoid second guessing the empirical assessments of state and local governments. *See, e.g., Alameda Books,* 535 U.S. at 451–52, 122 S.Ct. 1728 (Kennedy, J., concurring) (stating that "very little" evidence is required to establish a local government's purpose for enacting an ordinance); *see also DiMa Corp.,* 185 F.3d at 831 (permitting court to reject evidence contradicting that relied on by local government as long as other evidence supported government's conclusion). Based on the record, the County's conclusion that Chapter 31 would reduce the likelihood of service disruptions caused by labor disputes was reasonable. Thus, the County has demonstrated that Chapter 31 serves a proprietary goal.[18]

The County has also established that Chapter 31 is specifically tailored to its proprietary goal. Unlike government actions that have been found not to be specifically tailored, *see Reich,* 74 F.3d at 1338, Chapter 31 applies only to employees "whose work results from or has some tangible relationship to the provision of contractual services purchased by [the County]," Ord. § 31.02(f)(3). *See Allbaugh,* 295 F.3d at 36 (finding government action proprietary in part because it did not apply to projects unrelated to the government's proprietary interest). Moreover, Chapter 31 does not apply to *all* County contracts, but only those involving the provision of care, treatment or transportation services to the elderly or disabled. Thus, Chapter 31 applies only to contracts in which the County has identified a specific need for uninterrupted service. Accordingly, Chapter 31 is specifically tailored.

In summary, for the reasons stated above, Chapter 31 serves the County's proprietary goals and therefore is not subject to NLRA preemption.

## IV. FIRST AMENDMENT CLAIM

Plaintiff also argues that Chapter 31 violates the First Amendment on its face. Specifically, plaintiff challenges four subsections of Chapter 31: § 31.02(f)(1)'s requirement that employers agree not to provide "false or misleading information ... intended to influence the determination of employee preference regarding un-

---

**18.** In an amicus brief, the NLRB argues that Chapter 31 is not a reasonable response to the problem of potential service disruption because it fails to require unions to request a labor neutrality agreement. However, it is unclear whether the County could require such a request. Chapter 31 governs County contractors, not unions. The County does not contract with unions for the provision of services. Thus, were the County to require specified union action, the ordinance would likely be a general regulation subject to NLRA preemption. In any case, because unions prefer to enter into neutrality agreements, *see, e.g.,* Reice & Berner, *supra* (stating that "[u]nions strongly favor neutrality and card check agreements"), it is highly unlikely that a union would not request one; thus, the County likely viewed the risk that a union could de-

feat the purpose of Chapter 31 by not requesting a neutrality agreement as sufficiently low such that it did not need to legislate around that risk.

The NLRB also argues that Chapter 31 is not the optimal method of preventing service disruptions and that the County should instead require contractors to "guarantee uninterrupted delivery of the contracted-for services in the event of a labor dispute and to cover the purchaser's related costs if that guarantee is breached." (NLRB Br. at 11.) However, the County's goal is to avoid service disruptions, not to receive compensation in the event that services are disrupted. The County has determined that Chapter 31 is the optimal method of preventing service disruptions. Because that determination is reasonable, I will not second-guess it.

ion representation;" § 31.02(f)(3)'s requirement that employers agree to provide the labor union with "a complete and accurate list of the names, addresses and phone numbers of the employees of the employer working within the appropriate bargaining unit;" § 31.02(f)(4)'s requirement that employers agree to "provide the [labor] organization's members and representatives timely and reasonable access to the workplace for the purpose of providing employees with information about the organization, provided that there is no interference with the conduct of the employer's business;" and § 31.02(f)(7)'s ban on requiring employees "to attend a meeting or event that is intended to influence his or her decision in selecting or not selecting a bargaining representative." Before addressing plaintiff's arguments, I discuss the standards governing facial challenges.

## A. Standards Governing Facial Challenges

A constitutional challenge may either be facial or "as-applied." *See, e.g., MDK, Inc. v. Village of Grafton*, 277 F.Supp.2d 943, 947 (E.D.Wis.2003) ("*MDK I*"). A facial challenge contends that a law or section thereof cannot be constitutionally applied to any set of facts, and an as-applied challenge argues that the provision challenged is unconstitutional only as applied to the facts of the case under consideration. *Id.* Because "facial invalidation 'is, manifestly, strong medicine,'" it must be employed "'sparingly and only as a last resort.'" *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (quoting *Broadrick v.*

*Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). The party asserting that a law is facially invalid bears the "heavy burden" of demonstrating that facial invalidation is appropriate. *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

 In the First Amendment context, a law may be facially invalid if it is (1) overbroad, or (2) unconstitutional in every application. *See Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 796, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); *MDK, Inc. v. Village of Grafton*, 345 F.Supp.2d 952, 959 (E.D.Wis.2004) ("*MDK II*"). The overbreadth doctrine invalidates a law that permissibly regulates some speech but is written so broadly that it punishes a "substantial" amount of protected speech. *See Virginia v. Hicks*, 539 U.S. 113, 118–19, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003). Such challenges are permitted because the threat of enforcement of an overbroad law may "chill" protected speech. *Id.* at 119, 123 S.Ct. 2191.[19] A showing that a law "punishes a 'substantial' amount of protected free speech, 'judged in relation to the [law's] plainly legitimate sweep,' suffices to invalidate *all* enforcement of that law, 'until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression.'" *Id.* at 118–19, 123 S.Ct. 2191 (quoting *Broadrick*, 413 U.S. at 613, 615, 93 S.Ct. 2908) (emphasis in original). A law is unconstitutional in every application when the law itself—as opposed to some

**19.** On this point, the Supreme Court states:
Many persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech—harming not only themselves but society as a whole, which is

deprived of an uninhibited marketplace of ideas. Overbreadth adjudication, by suspending *all* enforcement of an overinclusive law, reduces these social costs caused by the withholding of protected speech.
*Hicks*, 539 U.S. at 119, 123 S.Ct. 2191 (citation omitted, emphasis in original).

number of its applications—contains a defect that renders it unconstitutional under the applicable substantive constitutional standard. *MDK II*, 345 F.Supp.2d at 960 (citing *Sec'y of State of Maryland v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 958–59, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984), and *Schultz v. Frisby*, 807 F.2d 1339, 1349 (7th Cir.1986)). A law that fails to satisfy the constitutional standard under which it must be evaluated cannot constitutionally be applied to any set of facts. *See id.* at 960–61, 104 S.Ct. 2839.

## B. Application of Standards

Plaintiff does not specify whether its facial challenges are based on overbreadth or on the unconstitutional in every application doctrine. However, based on the substance of plaintiff's arguments and the fact that plaintiff never mentions overbreadth, I conclude that plaintiff's argument is that the challenged subsections are unconstitutional in every application. I also understand plaintiff to be arguing that the unconstitutional subsections are not severable from the remainder of Chapter 31, and that therefore Chapter 31 is invalid in its entirety.

 In order to analyze plaintiff's First Amendment challenge to Chapter 31, I must first determine the appropriate standard of review. *Deida v. City of Milwaukee*, 176 F.Supp.2d 859, 864 (E.D.Wis. 2001). When a governmental entity acts as a contractor or employer, it has broader authority to restrict the speech of the party with whom it contracts or whom it employs than it does when it acts as a sovereign and restricts the speech of members of the public. *Bd. of County Comm'rs, Wabaunsee County, Kan. v. Umbehr*, 518 U.S. 668, 673–81, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996); *Waters v.*

*Churchill*, 511 U.S. 661, 671, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion).[20] Because "[t]he government needs to be free to terminate both employees and contractors for poor performance, to improve the efficiency, efficacy, and responsiveness of service to the public, and to prevent the appearance of corruption," *Umbehr*, 518 U.S. at 674, 116 S.Ct. 2342, "even many of the most fundamental maxims of [the Court's] First Amendment jurisprudence cannot reasonably be applied to speech by government employees [and contractors]," *Waters*, 511 U.S. at 672, 114 S.Ct. 1878. Nonetheless, the First Amendment provides some protection to government contractors because contractual relationships provide "valuable financial benefit[s], the threat of the loss of which in retaliation for speech may chill speech on matters of public concern by those who, because of their dealings with the government, 'are often in the best position to know what ails the agencies for which they work.'" *Umbehr*, 518 U.S. at 674, 116 S.Ct. 2342 (quoting *Waters*, 511 U.S. at 674, 114 S.Ct. 1878). Thus, courts evaluate free speech claims by government contractors under a balancing test known as the *"Pickering"* test, which weighs the government's interests as contractor against the contractor's free speech interests. *See id.* at 685, 114 S.Ct. 1878; *Connick v. Myers*, 461 U.S. 138, 142–54, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

To prevail on a First Amendment claim under *Pickering*, a contractor must prove that the government terminated his or her contract for speech related to a matter of public concern. *See, e.g., Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir.2002). Whether speech addresses a matter of

**20.** Unless otherwise noted, all citations to *Waters* are to the plurality opinion.

public concern depends upon the "'content, form and context of [the speech] as revealed by the whole record,'" *id.* at 906–07 (citing *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684) (alteration in original), and on whether "the speech can fairly be said to relate to a matter of political, social, or other concern to the community, rather than merely a personal grievance of interest only to the employee [or contractor]," *id.* at 907. If the contractor shows that the government terminated him or her for speech related to a matter of public concern, the government can still prevail if it shows that its interest in efficiently providing government services outweighs the contractor's First Amendment interests. *Id.* Courts generally defer to a government's reasonable assessments of its interests as a contractor. *Umbehr*, 518 U.S. at 678, 116 S.Ct. 2342; *Waters*, 511 U.S. at 673, 114 S.Ct. 1878.

■ In a typical case under *Pickering*, the plaintiff alleges that the government took action against him or her based on speech, and the court's task is to determine whether the government's interest as employer or contractor justified such action. *See, e.g., Gustafson*, 290 F.3d at 904. In the present case, however, plaintiff's challenge is directed at *future* applications of Chapter 31, i.e., plaintiff argues that when, in the future, the County terminates a contractor for not complying with one or more of the challenged subsections of a labor peace agreement, it will have violated the contractor's First Amendment rights. As discussed, to prevail on its facial challenge, plaintiff must show that every application of Chapter 31 is unconstitutional. In the present context, this requirement means that plaintiff must show that every future application of a challenged subsection fails the *Pickering* balancing test. *See Salerno*, 481 U.S. at 745, 107 S.Ct. 2095. Specifically, plaintiff must show that every possible statement by an employer that could be found to violate a labor peace agreement relates to a matter of public concern, and that in no case would the County's interest as a contractor outweigh the employer's First Amendment interests. Because *"Pickering* requires a fact-sensitive and deferential weighing of the government's legitimate interests," *Umbehr*, 518 U.S. at 677–78, 116 S.Ct. 2342, it is highly unlikely that plaintiff could satisfy this burden. In any case, plaintiff has made no attempt to do so. Although plaintiff cites *Pickering* and its progeny (Pl.'s Reply Br. [R. 123] at 33, 39–44), it does not try to show that even a single application of Chapter 31 fails the *Pickering* balancing test.[21] Thus, plaintiff fails to establish that Chapter 31 is facially unconstitutional.

Finally, although plaintiff does not mention it, *United States v. National Treasury Employees Union*, 513 U.S. 454, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) (*"NTEU"*), may be relevant to the present case. *NTEU* concerned a prohibition on federal employees accepting compensation for speaking or writing articles, even if the subject of the speech or article and the sponsoring entity were unconnected to the

---

**21.** Plaintiff argues that Chapter 31 is content-based and thus subject to strict scrutiny. However, this and other of plaintiff's First Amendment arguments are misplaced because they ignore the fact that, in restricting speech under Chapter 31, the County is acting as a contractor. When the government acts as a contractor or employer, it is permitted to make content-based distinctions and restrict the protected speech of its employees so long as its action satisfies the *Pickering* balancing test. *See Waters*, 511 U.S. at 671–75, 114 S.Ct. 1878 (stating that "even many of the most fundamental maxims of our First Amendment jurisprudence cannot reasonably be applied to speech by government employees").

employee's official duties. *Id.* at 457, 115 S.Ct. 1003. When federal employees brought a First Amendment challenge to this "honoraria ban," the Court stated it would analyze their claim using the rationale of *Pickering.* *Id.* at 465, 115 S.Ct. 1003. However, the Court distinguished a typical *Pickering* claim, which "involve[s] a *post hoc* analysis of one employee's speech and its impact on that employee's public responsibilities," from the plaintiffs' challenge to the honoraria ban, which functioned as a "wholesale deterrent to a broad category of expression by a massive number of potential speakers." *Id.* at 466–68, 115 S.Ct. 1003. The Court found that because the ban had a "widespread impact" and "chill[ed] potential speech before it happen[ed]," the government's burden to justify the honoraria ban was greater than its burden would have been in the case of an isolated disciplinary action. *Id.* at 468, 115 S.Ct. 1003. The Court held that to justify the honoraria ban, the government was required to "show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression [were] outweighed by that expression's 'necessary impact on the actual operation' of the Government." *Id.*

Like the honoraria ban in *NTEU,* Chapter 31 restricts speech before it occurs. Thus, *NTEU* may supply the appropriate framework for evaluating Chapter 31. *See Crue v. Aiken,* 370 F.3d 668, 678 (7th Cir.2004) (stating that "[t]o oversimplify, *Pickering* applies to speech that has already taken place, for which the public employer seeks to punish the speaker," and that "*NTEU* applies when a prior restraint is placed on employee speech."); *Milwaukee Police Ass'n v. Jones,* 192 F.3d 742, 750 (7th Cir.1999) (applying *NTEU* rather than *Pickering* when the court did not "have the opportunity to consider the actual nature of the speech that was communicated and the impact it had on the workplace" and the court was instead presented with "a general prohibition against speech rather than an isolated communication that already occurred."). However, it is unclear that *NTEU* rather than *Pickering* governs plaintiff's claim. *See Crue,* 370 F.3d at 684 (Manion, J., dissenting) (stating that "before-and-after distinction" between *Pickering* and *NTEU* is an oversimplification and misstatement of the law).[22] In any case, because plaintiff does not mention *NTEU* much less argue that it controls its First Amendment challenge, it has waived the argument that *NTEU* supplies the appropriate standard of review. *See McKinney Restoration, Co., Inc. v. Ill. Dist. Council No. 1,* 392 F.3d 867, 872–73 (7th Cir.2004) (stating that arguments not raised in district court are waived); *United States v. Holm,* 326 F.3d 872, 877 (7th Cir.2003) (stating that "perfunctory and

---

**22.** Chapter 31 is distinguishable from the honoraria ban in *NTEU* in several respects. Unlike the honoraria ban, Chapter 31 cannot fairly be classified as a "wholesale deterrent to a broad category of expression by a massive number of potential speakers." *NTEU,* 513 U.S. at 467, 115 S.Ct. 1003. The honoraria ban applied to nearly two million potential speakers and restricted speech on almost *every* possible subject. *NTEU,* 513 U.S. at 457, 115 S.Ct. 1003; *id.* at 481–82, 115 S.Ct. 1003 (O'Connor, J., concurring in part and dissenting in part). In contrast, Chapter 31 applies only to employers who contract with the County for the provision of services to the elderly and disabled and only to speech made during union organizing. *See* Ord. §§ 31.02(f)(1) to (7). Further, Chapter 31 leaves open ample opportunities for employers to communicate their views regarding unionization to their employees. *Compare Messman v. Helmke,* 133 F.3d 1042, 1047–48 (7th Cir.1998) (distinguishing *NTEU* in part on ground that it involved a "blanket restriction on speech" and law at issue in *Messman* left open many "alternate venues" for employee speech).

undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)," and that "[i]t is not the obligation of [the] court to research and construct legal arguments open to parties, especially when they are represented by counsel.").

For the reasons stated above, plaintiff has not satisfied its "heavy burden" of demonstrating that Chapter 31 violates the First Amendment on its face. *Salerno*, 481 U.S. at 745, 107 S.Ct. 2095.

## V. DUE PROCESS CLAIM

Plaintiff also argues that Chapter 31 violates the Fourteenth Amendment's Due Process Clause on its face because § 31.02(f)(1)'s requirement that an employer agree not to "express to employees false or misleading information that is intended to influence the determination of employee preference regarding union representation" is unconstitutionally vague. Plaintiff's argument is based on its contention that "false and misleading" is vague.[23] I consider this argument below.

### A. Standard for Determining Vagueness

"It is a general principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *see also Connally v. Gen. Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926) (stating that "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its mean-

ing and differ as to its application violates the first essential of due process of law."). The Supreme Court has identified three features of a vague law that render it appropriate for invalidation: (1) it fails to give fair warning of what is prohibited; (2) it fails to provide explicit standards for those who apply it and thus creates a risk of arbitrary and discriminatory enforcement; and (3) because of its lack of clarity, it chills lawful behavior. *Grayned,* 408 U.S. at 108–09, 92 S.Ct. 2294. However, the Court has also stated that "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Id.* at 110, 92 S.Ct. 2294.

As stated, plaintiff challenges Chapter 31 on its face. However, plaintiff does not discuss the standards applicable to facial vagueness challenges. Further, it is not entirely clear when a law may be found facially invalid on vagueness grounds. *Compare City of Chicago v. Morales,* 527 U.S. 41, 55, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (plurality opinion) (stating that "[w]hen vagueness permeates the text of [a criminal law that contains no *mens rea* requirement and infringes on constitutionally protected rights], it is subject to facial attack"), *with id.* at 71, 119 S.Ct. 1849 (Breyer, J., concurring) (stating that a vague law is facially invalid because it is unconstitutional in every application), *and id.* at 74–83, 119 S.Ct. 1849 (Scalia, J., dissenting) (stating that a vague law is facially invalid only if there is no set of circumstances to which the law clearly applies), *and Kolender v. Lawson,* 461 U.S. 352, 358 n. 8, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (stating that law need not be vague in all possible applications before it

---

**23.** Plaintiff also argues that because the phrase "false and misleading" is vague and an arbitrator has the final say as to whether an employer's speech is false and misleading, Chapter 31 contains a standardless delegation

of discretion to arbitrators. However, this argument is no different than the argument that the term "false and misleading" is vague. Thus, I need not address it separately.

is unconstitutionally vague on its face). However, I need not determine when vagueness renders a law facially invalid because, as explained below, Chapter 31 is not vague in any application.[24]

## B. Application of Standard

 Plaintiff argues that the phrase "false and misleading," particularly the term "misleading" is vague. However, the meaning of the word "misleading" is clear. Information is "misleading" if it "tend[s] to mislead." *See Webster's Third New International Dictionary* 1444 (1986). The ordinary meaning of "mislead" is "to lead in a wrong direction or into a mistaken action or belief." *Id.* Thus, information is misleading if it "tends to lead in a wrong direction or into a mistaken action or belief." Accordingly, an employer violates a labor peace agreement containing the language mandated by § 31.02(f)(1) when: (1) the employer expresses information to employees that tends to lead the employees in a wrong direction or cause them to take a mistaken action or hold a mistaken belief; and (2) the employer expresses such information to its employees with the intent that the information will "influence the determination of employee preference regarding union representation." This standard is not so unclear that persons of common intelligence must necessarily guess at its meaning. *Connally,* 269 U.S. at 391, 46 S.Ct. 126.

Plaintiff appears to maintain that "misleading" is vague because it is unclear "whether the standard to be used in determining whether speech is 'misleading' is an objective or subjective one." (Pl.'s Br. in Supp. [R. 88] at 50.) Plaintiff seems to suggest that it is unclear whether a statement may be considered "misleading" simply because an employee considers it to be so. However, the ordinary meaning of "misleading" makes clear that a statement is not misleading simply because an employee is misled. As explained, a statement is misleading only if it "*tend[s]* to mislead." *Webster's Third New International Dictionary* 1444 (emphasis added). Accordingly, whether a statement is misleading is determined objectively by looking at the statement and its context and determining whether it "tends" to mislead, rather than by asking how a particular listener perceived it.

Plaintiff also appears to argue that "misleading" is vague because it is unclear whether misleading statements are "limited to intentional actions or also include innocent mistakes," and whether Chapter 31 prohibits "factual, but incomplete statements." (Pl.'s Br. in Supp. [R. 88] at 50.) However, although it is unclear what plaintiff means by "intentional actions" and "innocent mistakes," it is clear that § 31.02(f)(1) only punishes speech if it is objectively misleading and the employer "*intended* [that the statement would] influence the determination of employee preference regarding union representation." Ord. § 31.02(f)(1) (emphasis added). Further, it is clear that § 31.02(f)(1) prohibits "factual, but incomplete statements" if such statements tend to mislead and are intended to influence employee preference regarding union representation. If it

---

**24.** Before addressing the merits of plaintiff's vagueness arguments, I note that to sustain a vagueness challenge to Chapter 31, plaintiff would have to contend with the *Pickering, Umbehr* and *NTEU* line of cases discussed above. This is so because the void for vagueness doctrine is applied less stringently when the government acts as an employer or con-

tractor. *See Waters,* 511 U.S. at 673, 114 S.Ct. 1878 (stating that although "speech restrictions must generally precisely define the speech they target ... surely a public employer may, consistently with the First Amendment, prohibit its employees from 'being rude to customers,' a standard almost certainly too vague when applied to the public at large.").

"tends to mislead," a true statement can be misleading. Thus, these vagueness arguments fail.[25]

Finally, plaintiff contends that the phrase "false and misleading" is vague because § 31.02(f)(2) provides that unions must agree not to "misrepresent to employees the facts and circumstances surrounding their employment." Plaintiff's argument is that use of the phrase "false and misleading," referring to statements by employers, and the word "misrepresent," referring to statements by unions, somehow makes the meaning of both words ambiguous. However, as stated, the ordinary meaning of "misleading" is clear. The ordinary meaning of "misrepresent" is also clear. *See Webster' Third New International Dictionary* 1445 (defining "misrepresent" as "to represent incorrectly: to give a false, imperfect, or misleading representation of"). Thus, "false and misleading" and "misrepresent" are synonyms. Plaintiff's argument appears to be that even though "misrepresent" and "false and misleading" are synonymous, by using different words, the County must have intended that each would have a different meaning without indicating what that meaning was. However, it does not follow from the fact that the County used different words having the same meaning that it intended those words to have different, unknown meanings. Further, nothing in the text or structure of Chapter 31 indicates that the County intended "false and misleading" and "misrepresent" to have different meanings. Instead, the most reasonable reading of Chapter 31 is that these terms are identical.

Thus, for the above reasons, all of plaintiff's vagueness arguments fail.

## VI. CONCLUSION

**THEREFORE, IT IS ORDERED** that plaintiff's motion for summary judgment and permanent injunction is **DENIED.**

**IT IS FURTHER ORDERED** that defendant's motion for summary judgment is **GRANTED.**[26]

**IT IS FURTHER ORDERED** that the National Labor Relations Board's petition for leave to file an amicus curiae brief is **GRANTED.**

**IT IS FURTHER ORDERED** that the petition of the Allied Council of Senior Citizens et al., for leave to file an amicus curiae brief is **GRANTED.**

---

25. It appears that some of plaintiff's vagueness arguments might have been better cast as overbreadth arguments. For example, plaintiff could have argued that employers have a constitutional right to make true but misleading statements, but not intentionally false statements, and that by prohibiting true but misleading statements, Chapter 31 is overbroad. However, as previously discussed, the government enjoys greater leeway to restrict the speech of government contractors than the speech of the general public, *Umbehr,* 518 U.S. at 673–81, 116 S.Ct. 2342, and plaintiff has not attempted to show that any section of Chapter 31 does not meet the standards applicable to a government's restriction of the speech of its contractors. Thus, as with its other First Amendment facial challenges, plaintiff has failed to shoulder its burden of demonstrating that Chapter 31 is overbroad. *See Hicks,* 539 U.S. at 122, 123 S.Ct. 2191 (stating that "[t]he overbreadth claimant bears the burden of demonstrating, 'from the text of [the law] and from actual fact,' that substantial overbreadth exists.").

26. Defendant requests that the court award the County its reasonable attorneys' fees "[t]o the limited extent attorneys' fees are available to the prevailing party in the present action." (Def.'s Br. in Supp. [R. 108] at 58.) However, defendant makes this argument in an extremely cursory fashion and does not support it with pertinent authority. Therefore, the argument is waived. *See, e.g., Morrell,* 270 F.3d at 1095 n. 1.

**FINALLY, IT IS ORDERED** that this case be **DISMISSED** and that the Clerk of Court enter judgment accordingly.